**Certiorari Denied, January 17, 2014, No. 34,282**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-018**

**Filing Date: July 16, 2013**

**Docket No. 31,130**

**DR. CHITRA BHANDARI,**

  **Plaintiff-Appellee,**

**v.**

**ARTESIA GENERAL HOSPITAL and
VHA SOUTHWEST COMMUNITY
HEALTH CORPORATION,**

  **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY
J. Richard Brown, District Judge**

Civerolo, Gralow, Hill & Curtis, P.A.
Lisa Entress Pullen
Angela Chavez-Adkins
Albuquerque, NM

for Appellee

Greenberg Traurig, LLP
Mary-Olga Lovett
Houston, TX

Sandenaw Law Firm, P.C.
Thomas A. Sandenaw, Jr.
CaraLyn Banks
Las Cruces, NM

for Appellants

**OPINION**

1

**KENNEDY, Chief Judge.**

**{1}**   Plaintiff Dr. Chitra Bhandari (Bhandari) and her husband were both doctors at Artesia General Hospital (the Hospital).  At a meeting to terminate her husband from the Hospital, Bhandari was told that her husband would be allowed to resign if she did so as well and, if she did not, he would be fired.  She was not the subject of any personnel action by the Hospital.  Prior to the meeting, the Hospital's general counsel had prepared a memorandum concerning the termination process and scripting the matter of forcing Bhandari's resignation.  The district court ruled that the memorandum was not privileged and therefore discoverable and admitted the memorandum into evidence.  The Hospital appeals the district court's ruling regarding the memorandum.

**{2}**   Additionally, the district court, relying in part on the memorandum in question, found that the Hospital had maliciously and willfully breached its contract with Bhandari by using her husband's situation to pressure her to resign, even though she was not the subject of any personnel action.  The district court awarded her compensatory and punitive damages.  As we determine that the memorandum constitutes unprivileged business advice, and the district court did not err in admitting or considering it, we affirm the district court.  The district court correctly assessed the basis for its award of damages, and we also affirm the district court's award of punitive damages.

## I.   BACKGROUND

**{3}**   Bhandari and her husband accepted positions at the Hospital in March 2005.  The Hospital is operated by VHA Southwest Community Health Corporation (the Corporation), which leased the Hospital facility from the Artesia Special Hospital District.   The Corporation employed Kenneth Randall as the Chief Executive Officer of the Hospital.  It also employed David Butler, who served as Senior Vice President and General Counsel for the Corporation.

**{4}**   The Hospital began to investigate Bhandari's husband in the summer of 2006.  Randall, Butler, and attorneys from Butler's legal department were involved in the investigation.  They concluded that her husband had violated his contract and determined the Hospital should terminate him.  The Hospital scheduled a meeting to discuss the termination.

**{5}**   On September 26, 2006, the meeting took place between Bhandari, her husband, Randall, and Butler.  Randall had staff summon both Bhandari and her husband to the meeting.  The parties dispute the substance and tone of the meeting.  Randall and Butler testified that the meeting was businesslike and resulted in Bhandari and her husband agreeing to resign independent of the terms of their individual separation agreements.  Bhandari testified that there was much conflict at the meeting, and Butler and Randall told her they would terminate her husband for cause unless she accepted the "[s]eparation [a]greement" herself.  A draft of the separation agreement was given to Bhandari at this

2

meeting by Butler and Randall.

**{6}** Prior to Butler's arrival for the termination meeting, he and his staff had created the disputed memorandum containing "talking points" to prepare for the meeting with Bhandari and her husband. This memorandum was essentially a script designed to direct the Hospital's representatives toward their goal of forcing Bhandari's resignation, although the Hospital had no reason to do so apart from its desire to rid itself of both Bhandari and her husband. The parties dispute whether the memorandum constitutes legal or business advice, and whether it was used during the meeting.

**{7}** The district court found that the termination of Bhandari and her husband was planned "well in advance." Butler testified that his goal in going to Artesia was to "seek and obtain" Bhandari's resignation. Bhandari and her husband closed their practices at the Hospital immediately after the meeting.

**{8}** Bhandari sued the Hospital and the Corporation for breach of contract, economic coercion/bad faith, and misrepresentation. Bhandari sought to use the memorandum as evidence. During discovery, the Hospital claimed that the memorandum was shielded by the attorney-client privilege. The district court ruled that the privilege did not apply and that the memorandum was discoverable, along with other documents pertaining to her, but not her husband's, separation from the Hospital. The district court found that Butler's involvement and communications setting up the separation of Bhandari were materially different from the investigation leading to the termination of her husband and facilitated business-related decisions, while his involvement with her husband's separation primarily amounted to legal advice. The Hospital again claimed the privilege when Bhandari tried to admit the memorandum at trial, and the district court again ruled that the document was unprivileged and admitted it. At the conclusion of the bench trial, the district court awarded Bhandari compensatory damages for the Hospital's breach of her contract, representing her lost salary and benefits over the remaining life of her contract in the amount of $194,048.05. The district court also awarded punitive damages in the same amount as the compensatory damages award. The Hospital appealed.

## II.    DISCUSSION

### A.    The Memorandum Was Not Privileged

**{9}** "Generally, we review discovery orders for abuse of discretion." *Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007-NMCA-133, ¶ 9, 143 N.M. 215, 175 P.3d 309. The burden is on the party claiming the privilege to show that the communication falls within its scope. *Id.* ¶ 13. "Although a misapplication of the law is considered an abuse of discretion, our courts review de novo the initial decision of whether the correct legal standard has been applied." *Brooks v. Norwest Corp.*, 2004-NMCA-134, ¶ 7, 136 N.M. 599, 103 P.3d 39. "Accordingly, we may characterize as an abuse of discretion a discretionary decision that is premised on a misapprehension of the law." *N.M. Right to Choose/NARAL v. Johnson*,

3

1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (alteration, internal quotation marks, and citations omitted); *Aragon v. Brown*, 2003-NMCA-126, ¶ 9, 134 N.M. 459, 78 P.3d 913 ("[T]he trial court abuses discretion when . . . its discretionary decision is premised on a misapprehension of the law."). Upon review, we conclude that the evidence in this case supports the district court's determination that the memorandum in question is business advice and does not fall under the privilege Defendants claimed. Therefore, the district court did not abuse its discretion.

**{10}** The attorney-client privilege is designed to permit clients to keep communications with their attorneys confidential, so they may freely seek legal advice. 1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 2:1, at 6 (2d ed. 1999). The rule is intended to operate by encouraging clients to disclose more information to their attorneys. *Id.* § 2:3, at 14-15. When clients are uninhibited by the fear of their statements to an attorney becoming evidence, an attorney may provide more thorough and accurate legal advice. *Id.*; *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888); Gregory C. Sisk & Pamela J. Abbate, *The Dynamic Attorney-Client Privilege*, 23 Geo. J. Legal Ethics 201, 215 (2010) ("The confidential nature of the attorney-client relationship is the foundation for everything the lawyer does.").

**{11}** Rule 11-503 NMRA governs the scope of the attorney-client privilege in New Mexico. The rule states that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client[.]" Rule 11-503(B). "The elements of attorney-client privilege . . . are . . . a communication . . . made in confidence . . . between privileged persons . . . for the purpose of facilitating the attorney's rendition of professional legal services to the client." *Santa Fe Pac.*, 2007-NMCA-133, ¶ 14. The question in this case turns on the final factor—whether Butler was providing legal services to his client, the Hospital, when creating the memorandum.

**{12}** The parties do not dispute that a client may "refuse to disclose confidential communications between certain persons if the communications were made for the purpose of acquiring legal advice for the client." *Id.* ¶ 13. "The privilege protects communications generated or received by an attorney giving legal advice but does not protect communications derived from an attorney giving business advice or acting in some other capacity." *Id.* ¶ 23. Attorneys for businesses also provide non-legal services, such as "negotiating contracts, analyzing potential corporate transactions, and investigating potential claims." Sisk, *supra*, at 210 (internal quotation marks and citations omitted).

**{13}** This Court in *Santa Fe Pacific* foresaw the complications arising from the dual nature of an in-house attorney, such as Butler, who may provide his client with both legal and business advice. 2007-NMCA-133, ¶ 27 ("Application of the privilege can be difficult when the client is a corporation seeking legal advice regarding a business transaction and when the client's attorney is in-house counsel who wears 'two hats' by performing a dual role of legal advisor and business advisor." (citation omitted)). We relied on *Duplan Corp. v.*

4

*Deering Milliken, Inc.*, which stated more specifically that "the attorney-client privilege does not attach where the . . . attorney is giving technical or business, as opposed to legal, advice." 397 F. Supp. 1146, 1167 (D.S.C. 1974).

**{14}** Bhandari's position is that Butler's role in her separation from the Hospital involved no legal advice, and the memorandum was solely business advice. Bhandari also claims that because the memorandum replicated testimony already admitted at trial, it could not be prejudicial even if wrongly admitted. She rightly points out that the burden is on the party claiming the privilege to prove the communication is confidential. The district court's findings support this position. The district court clearly distinguished between Butler's role in investigating Bhandari's husband to support his termination for cause and Butler's actions to secure Bhandari's separation when no reason existed to terminate her. The district court ultimately found that the amount of planning undertaken to secure the resignation of Bhandari without cause, and Butler's admission that he attended the meeting specifically to secure that result, both supported a business purpose divorced from any legal concern when it came to Bhandari.

**{15}** There is scant New Mexico law distinguishing legal advice from business advice, and the district court recognized the difficulty in applying the privilege. Both parties cite *Gingrich v. Sandia Corp.*, 2007-NMCA-101, 142 N.M. 359, 165 P.3d 1135. In that case, Sandia hired an outside attorney to investigate alleged wrongdoing inside the corporation. *Id.* ¶ 3. Both attorney-client privilege and work-product immunity were at issue, and we concluded that the disputed documents were protected because the investigation was conducted in anticipation of litigation. *Id.* ¶ 11. This reasoning reflects work-product protections and parallels the district court's reasoning in its discovery order and later findings regarding the Hospital's position relative to terminating Bhandari's husband. *See id.* ¶ 9. However, because *Gingrich* is rooted in work-product immunity, rather than attorney-client privilege, as well as our determination that attorney-client privilege was waived, it provides meager guidance for Bhandari's situation. *Id.* ¶ 20.

**{16}** Although New Mexico has not defined the contours of when the privilege may be invoked for in-house counsel who provide both legal and business advice, other jurisdictions have settled that

> [i]f the primary purpose of a communication is to solicit or render advice on non-legal matters, the communication is not within the scope of the attorney-client privilege. Only if the attorney is "acting as a lawyer" giving advice with respect to the legal implications of a proposed course of conduct may the privilege be properly invoked. In addition, if a communication is made primarily for the purpose of soliciting legal advice, an incidental request for business advice does not vitiate the attorney-client privilege.

*Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 147 (D. Del. 1977); *see In re Cnty. of Erie*, 473 F.3d 413, 421 (2d Cir. 2007); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D.

132, 137 (N.D. Ill. 1993); *United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 206, 212 (S.D.N.Y. 1974); *Oil Chem. & Atomic Workers Int'l Union (OCAWIU) v. Am. Home Prods.*, 790 F. Supp. 39, 41 (D.P.R. 1992) ("Even though in[-]house counsel may also benefit from the attorney-client privilege, it must be in situations where legal and not technical advice is at issue."); *Upjohn Co. v. United States*, 449 U.S. 383, 396 (1981).

**{17}** We agree with the analysis by these other courts and conclude that "[a]n in-house counsel's communications regarding business matters, management decisions, and business advice, which neither solicit or predominantly deliver legal advice, are not privileged." *Anaya v. CBS Broad., Inc.*, 251 F.R.D. 645, 650 (D.N.M. 2007). However, "[t]he law provides no standards beyond these generalities for distinguishing legal from non[-]legal advice." 1 Rice, *supra*, § 7:9, at 68.

**{18}** We find *Lindley v. Life Investors Insurance Co. of America* particularly useful for its analysis of how to untangle an in-house attorney's legal and business advice. 267 F.R.D. 382 (N.D. Okla. 2010). The court in *Lindley* acknowledged that an in-house attorney is frequently presumed to be providing business advice, while outside counsel is presumed to provide legal advice, but it does not base its decision solely on that distinction. *Id.* at 390-91. Besides the status of the attorney, the court considered the nature of the advice given, the context, content, and purpose of the communication when determining whether the communication was legal advice. *Id.* at 391. If the communication involves both business and legal issues, the court must determine the "*primary* or *predominate purpose*" of the communication. 1 Rice, *supra*, § 7:5, at 44. The *Lindley* court explained a balancing test for when the legal and business purposes are "inextricably intertwined" when the primary purpose cannot be ascertained, "the entire communication is privileged only if the legal purpose outweighs the business purpose." 267 F.R.D. at 392. In short, a court faced with a situation where the primary purpose of a communication is not clearly legal or business advice should conclude the communication is for a business purpose, unless evidence clearly shows that the legal purpose outweighs the business purpose.

**{19}** Against this backdrop, we examine the district court's treatment of the memorandum in this matter to determine whether its primary purpose was to provide legal advice. At the outset, we note again that only Bhandari's husband was being terminated. Bhandari was not the subject of any personnel action, yet was summoned to a meeting at which the Hospital had planned to execute a plan to force her to resign, so as to remove them both from its employ. Although the memorandum bears a heading that states it is "[c]onfidential [and] subject to attorney-client privilege," it is essentially a script for securing Bhandari's resignation, couched as "[t]alking points for termination interview with . . . Bhandari [and her husband]." In no particular detail, it outlines that Bhandari's husband would be terminated for cause, the reasons why the Hospital believed he had breached the contract, and the process by which they would both leave their jobs. The memorandum states that, if the employee being terminated storms out, the Hospital is still required to mail some notices to him. The memorandum is clearly directed at securing Bhandari's separation. It also states that the basic terms of the severance agreement are "contingent on both doctors

6

resigning and agreeing to the separation agreement." Clearly, the Hospital contemplated the severance agreement to encompass the otherwise uninvolved Bhandari.

{20}    The district court based its decision to admit the memorandum on its finding that Butler's role with respect to Bhandari was primarily business-related, while his role was legal with respect to her husband. The district court's findings reflect the "delicate problems for the Hospital" posed by both doctors sharing office space and "[m]ost importantly" being husband and wife. These are not legal concerns, but rather management problems where Bhandari is concerned. The strategic requirement that two resignations were necessary for the separation agreement supports the district court's conclusion that the memorandum was business advice. The district court noted in its findings that this term supported Bhandari's testimony of what terms the Hospital offered at the meeting. The memorandum also listed the "[n]ext steps" that the Hospital would take, such as asking Bhandari's husband to remove his property immediately and transition patients, although it mentioned that Bhandari's own termination might be delayed to complete such a transition.

{21}    The district court found that the Hospital's preparation for the meeting proved their intention to force Bhandari's resignation despite the fact that they had no cause to terminate her employment as Butler and Randall testified. When Butler prepared the memorandum for the meeting, he was providing legal advice to the Hospital concerning Bhandari's husband's failure to comply with the Hospital's policies and employment contract. However, he was advising the Hospital, as a business matter, how to best secure a resignation from Bhandari, who was not the target of any personnel action, but whose resignation would be convenient for the Hospital from a business standpoint. Some legal contingencies were planned for. Butler was acting in dual roles: (1) in a legal capacity, as general counsel for the Corporation; and (2) in a business capacity, as Senior Vice President of the Corporation. Although Butler had both a legal and a business interest in making sure the termination did not omit necessary procedures for Bhandari's husband, he sought to promote the purely business interest in making sure that she and her husband no longer worked at the Hospital by the end of the meeting. Bhandari's unjustified and forced participation in a joint separation with dual resignations furthered the Hospital's business interest. The memorandum provided an outline for the Hospital to reach its business goals. He admitted that one of his goals was to "seek and obtain" Bhandari's resignation, although Bhandari had not violated her contract. We agree with the district court that, in such context, securing her resignation was a business, not a legal, decision. The Hospital was trying to end its business relationship with her at the meeting. Butler provided the memorandum as a mixture of legal and business advice in his capacity as both in-house counsel and a senior vice president of the Corporation. We hold that the memorandum is business advice and thus unprivileged. The district court did not abuse its discretion in permitting discovery of the memorandum or admitting it at trial.

## B.    The District Court Did Not Err in Awarding Punitive Damages

{22}    The district court awarded Bhandari punitive damages in the amount equal to the sum

7

of the compensatory damages it awarded for breach of contract because it found that

> [the Hospital] acted with conscious awareness that their treatment of . . . Bhandari was wrongful and harmful to her[.] . . . [The Hospital] acted maliciously and recklessly by placing . . . Bhandari in a situation where she had to choose between first, continuing her contract at the risk of her husband's professional reputation, and second, resigning and accepting [the] terms.

Relying on *Gonzales v. Sansoy*, 103 N.M. 127, 129, 703 P.2d 904, 906 (Ct. App. 1984), the Hospital first argues that the district court erroneously based the punitive damages on different conduct than for which the compensatory damages were allowed. Although the Hospital recognizes that the district court's findings that the Hospital "contrived [a] strategy to coerce [Bhandari] to resign[,]" leveraged her marriage to secure her resignation, and insisted on her presence at the meeting underlie its award of punitive damages, we point out that these circumstances are all of a piece. The Hospital's conduct supporting both compensatory and punitive damages is consequently the same. The Hospital argues that the breach of Bhandari's contract occurred when the Hospital accepted Bhandari's resignation as final. This is a gross misstatement of the court's conclusion in two regards. First, the district court concluded that the Hospital breached the contract by "excluding her from her office, closing her practice, and terminating her salary and benefits among other things." Second, the district court specifically concluded that Bhandari did not resign, but that the Hospital had wrongfully terminated her contract. We also reject the Hospital's narrow interpretation of *Gonzales*.

**{23}** New Mexico cases have addressed the inappropriateness of awarding punitive damages against a party solely when there are no compensatory damages related to their behavior. *See Sanchez v. Clayton*, 117 N.M. 761, 767, 877 P.2d 567, 573 (1994); *see also In re Consol. Vista Hills Retaining Wall Litig.*, 119 N.M. 542, 554, 893 P.2d 438, 450 (1995). The compensatory damages in this case were awarded based on the Hospital's unjustified conduct, which breached Bhandari's contract by coercing her resignation without cause or any consideration of her position. The punitive damages were as well, and the district court did not err in awarding them.

**{24}** The Hospital next argues that the evidence at trial did not support a finding that its behavior constituted bad faith or reckless disregard, and that the district court erroneously relied heavily on the disputed memorandum in reaching its decision.

**{25}** The district court's decision to impose punitive damages is amply supported by the evidence. The district court concluded the Hospital acted maliciously and recklessly in its treatment of Bhandari. It concluded that the Hospital's conduct in forcing Bhandari to resign was "inconsistent with legitimate business interests, violates community standards of decency, and works to undermine the stability of expectations essential to contractual relationships." Those conclusions are not contrary to what is demanded by the facts of the

8

case. The record and testimony reflect that Butler and Randall knew they could not terminate Bhandari for cause. Evidence of the meeting, although sometimes contradictory, shows that the Hospital forced Bhandari's presence at the meeting that concerned her husband and then pressured her to resign by forcing her to weigh her resignation against her husband's professional reputation. Even though the Hospital argues that Bhandari's behavior at the meeting and after could be interpreted as willing participation in her resignation, the district court found no such willingness. When "reasons both supporting and detracting from a trial court decision [exist], there is no abuse of discretion." *Talley v. Talley*, 115 N.M. 89, 92, 847 P.2d 323, 326 (Ct. App. 1993). To the extent that the Hospital argues the district court relied unduly on the memorandum in awarding punitive damages, we restate the memorandum was relevant to the punitive damages, was properly admitted, and the district court was free to give it such weight as it believed was merited.

## C. The District Court Did Not Err by Refusing to Reduce Punitive Damages or Grant a New Trial

**{26}** The Hospital argues that the amount of punitive damages awarded is not proportionate to its behavior and violates due process. When reviewing an award of punitive damages, we apply de novo review, making an independent assessment of the record in order to determine whether the award of punitive damages is comparatively reasonable. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶ 19, 132 N.M. 401, 49 P.3d 662. When reviewing an award of punitive damages for reasonableness, we are guided by three criteria: "(1) the reprehensibility of the defendant's conduct, or the enormity and nature of the wrong; (2) the relationship between the harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil and criminal penalties authorized or imposed in comparable cases." *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 36, 140 N.M. 478, 143 P.3d 717. The third factor has been marginalized "as ineffective and very difficult to employ." *Aken*, 2002-NMSC-021, ¶ 25.

**{27}** As to the first factor, "the degree of reprehensibility of [a d]efendant's conduct is the most important indicium of the reasonableness of a punitive damages award." *Jolley v. Energen Res. Corp.*, 2008-NMCA-164, ¶ 32, 145 N.M. 350, 198 P.3d 376 (internal quotation marks and citation omitted). In considering reprehensibility, we determine whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* "New Mexico law allows a plaintiff who establishes a cause

of action in law to recover punitive damages as long as the wrongdoer's conduct is willful, wanton, malicious, reckless, oppressive, or fraudulent and in bad faith." *Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 28, 137 N.M. 80, 107 P.3d 520. In *Bogle*, an investment company breached its contract with a company it had contracted to serve as a buying agent in order to avoid paying the agent company its promised commission. *Id.* ¶ 6. We upheld an award of punitive damages because the breaching party's actions were sufficiently egregious and exceeded legitimate business reasons for a breach of contract. *Id.* ¶ 32. Regarding the first factor in the analysis of the amount of damages, we stated:

> Punitive damages are intended to punish the defendant and to deter future wrongdoing. Absent an award of punitive damages in this case, [the defendant] would have no incentive to refrain from cheating those with whom it does business in the future. Therefore, we find that [the defendant]'s conduct was sufficiently reprehensible to support the relatively modest punitive damages award imposed by the district court.

*Id.* ¶ 34 (internal quotation marks and citation omitted).

**{28}** First, substantial evidence supports the district court's conclusions that the Hospital was aware its deliberate treatment of Bhandari was wrongful. The Hospital acted "maliciously and recklessly by placing . . . Bhandari in a situation where she had to choose between first, continuing her contract at the risk of her husband's professional reputation, and second, resigning and accepting [the] terms." The Hospital's conduct is "inconsistent with legitimate business interests, violates community standards of decency, and works to undermine the stability of expectations essential to contractual relationships." To execute its bad motives, the Hospital planned and executed a method by which to coerce Bhandari into resigning by leveraging her husband's career against her resignation.

**{29}** The district court found that "Defendants took advantage of . . . Bhandari's marriage to Defendants' benefit and her detriment[,]" and they "necessarily contrived their strategy to coerce her to resign[.]" The district court found that the testimony supported Bhandari's position that she did not immediately agree to resign at the meeting and was surprised to find her office being cleaned out, her locks changed, and her cell phone confiscated when she returned from lunch after the meeting. The district court found that this reinforced that Defendants "acted knowingly and intentionally" to effect their strategy of terminating her contract without cause. Although the resulting harm was economic, not physical, it still damages Bhandari. We conclude that the behavior was reprehensible enough to warrant punitive damages, particularly to avoid future similar manipulations by employers.

**{30}** "The test under the second guidepost in New Mexico is that the amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Chavarria*, 2006-NMSC-046, ¶ 38 (alteration, internal quotation marks, and citation omitted). There is no bright-line rule about the ratio of punitive to compensatory damages. *Bogle*, 2005-NMCA-

024, ¶ 35. In *Bogle*, the punitive damages award in question was one and one-half times the amount of compensatory damages, which we upheld as "relatively modest." *Id.* As the ratio in this case is one-to-one and because the punitive damages were awarded in the same amount as the compensatory damages, we hold the amount to be proportional and uninflated by passion or prejudice.

**{31}** The third guidepost on the amount of punitve damages and the least important is "a comparison between [the p]laintiffs' punitive damages award and potential civil and criminal sanctions." *Chavarria*, 2006-NMSC-046, ¶ 39. "[W]hen statutory penalties for the conduct in question are low or do not exist, a consideration of the statutory penalty does little to aid in a meaningful review of the excessiveness of the punitive damages award." *Aken*, 2002-NMSC-021, ¶ 25 (internal quotation marks and citations omitted). No party has discussed if any civil or criminal sanctions apply to the Hospital's behavior. Bhandari argues that we should compare the issue here with the penalty for deceptive trade practices under New Mexico's Unfair Trade Practices Act that permits treble damages. However, Bhandari has no explanation of how the Hospital's actions would fall under that statute. The third guidepost, therefore, is of little help. However, the award passes scrutiny under the first two guideposts, and we therefore affirm the award of punitive damages because the amount did not violate the Hospital's constitutional due process rights.

**D.   The Hospital Fails to Support Its Argument That Bhandari Resigned or Reformed Her Contract**

**{32}** The Hospital argues that Bhandari orally amended her written contract at the meeting and thus properly resigned. However, it fails to point to any evidence in the record that contradicts the district court's findings. Pursuant to Rule 12-213(A)(3) NMRA, an appellant is required to provide a summary of proceedings that includes the evidence bearing upon the proposition that the appellant argues is unsupported by substantial evidence. When an appellant does not assert that "any finding made by the trial court was error, nor . . . referred to any requested conclusions refused by the trial court[,] . . . those findings are the facts before us." *Adams v. Thompson*, 87 N.M. 113, 117, 529 P.2d 1234, 1238 (Ct. App. 1974). Because the Hospital fails to identify which findings are unsupported by substantial evidence or to explain how so, we do not consider this issue further.

**III.   CONCLUSION**

**{33}** The memorandum prepared by the Corporation's general counsel in anticipation of the termination meeting was not shielded by attorney-client privilege. The district court properly found it discoverable and admissible at trial. The district court's award of punitive damages was not in error, and the amount did not violate constitutional due process. We affirm.

**{34}   IT IS SO ORDERED.**

11

_____

**RODERICK T. KENNEDY, Chief Judge**

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**LINDA M. VANZI, Judge**

**Topic Index for *Bhandari v. Artesia Gen. Hosp.*, No. 31,130**

**APPEAL AND ERROR**
Standard of Review

**ATTORNEYS**
Attorney-Client Privilege

**CONTRACTS**
Breach

**EMPLOYMENT LAW**
Employment Contract
Termination of Employment
Voluntary Leaving

**EVIDENCE**
Admissibility of Evidence
Attorney-Client Privilege
Privileges
Spousal Testimony

**JUDGES**
Abuse of Discretion

**REMEDIES**
Compensatory Damages
Punitive Damages