IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2025-NMCA-020

Filing Date: October 30, 2024

No. A-1-CA-40172

ALBUQUERQUE JOURNAL and
KOB-TV, LLC,

      Plaintiffs-Appellants/Cross-Appellees,

v.

BOARD OF EDUCATION OF ALBUQUERQUE
PUBLIC SCHOOLS and RIGO CHAVEZ, in his
capacity as Custodian of Records for Board of
Education for Albuquerque Public Schools,

      Defendants-Appellees/Cross-Appellants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nancy J. Franchini, District Court Judge**

Peifer, Hanson, Mullins & Baker, P.A.
Charles R. Peifer
Gregory P. Williams
Albuquerque, NM

for Appellants

Ortiz & Zamora, Attorneys at Law, LLC
Tony F. Ortiz
Daniel R. Rubin
Jessica R. Terrazas
Santa Fe, NM

for Appellees

**OPINION**

**HANISEE, Judge.**

**{1}**    This appeal is the second arising from a long-running dispute between Plaintiffs Albuquerque Journal (the Journal) and KOB-TV, LLC and Defendants the Board of

Education (the Board) of Albuquerque Public Schools (APS) and its prior records custodian, Rigo Chavez. Plaintiffs, advancing their case under the Inspection of Public Records Act (IPRA or the Act), NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 2023), seek public disclosure of certain documents related to the abrupt and premature resignation of Winston Brooks in 2014, then-Superintendent of APS, and the associated $350,000 buyout of his contract with public funds. In their direct appeal, Plaintiffs contend that the district court erred in concluding that a particular investigatory report, prepared by attorney Agnes Fuentevilla Padilla at the behest of the Board (the Padilla Report or the Report), fits within either of two enumerated exceptions to IPRA: public records that are matters of opinion contained within a personnel file, or public records protected by attorney-client privilege. *See* § 14-2-1(C), (G). On cross-appeal, Defendants challenge the district court's determination regarding IPRA's applicability to certain other documents, the district court's award of damages to Plaintiffs, and its denial of Defendants' requests for court costs. For the reasons set forth below, we affirm the district court on all grounds.

## BACKGROUND

{2}     The general factual background underlying this case was explained by this Court in our prior opinion resolving a separate appeal in this matter. *See Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 2019-NMCA-012, ¶¶ 3-5, 436 P.3d 1. We incorporate the facts set forth in that opinion and supplement them here as pertinent to the specific issues now before us.

{3}     On August 7, 2014, the Journal sent its first records request to APS seeking production of "any report Agnes Padilla . . . has provided through her legal services to the district." On August 8, 2014, Chavez denied the request on behalf of APS, stating that the only responsive document, the Padilla Report, was both a matter of opinion within a personnel file and a confidential legal communication. Plaintiffs thereafter filed the instant enforcement action seeking production of the Padilla Report in addition to other records discussed below. In April 2015, Defendants moved for summary judgment regarding the Padilla Report's status as excepted from disclosure under IPRA, but the case was then delayed by an appeal taken by Brooks' attorney, Maureen Sanders, who contested an order compelling disclosure of pertinent information she possessed regarding the Padilla Report to Plaintiffs. *See Albuquerque J.*, 2019-NMCA-012. Notably, while Defendants were not originally a party to Sanders' appeal, they opted to participate in the proceeding by opposing Plaintiffs' right to the information Sanders possessed, even informing this Court by motion that "the central issues of [Sanders'] appeal bear on the core interests of APS."

{4}     The resolution of Sanders' appeal took almost three-and-a-half years during which litigation regarding Defendants' motion for summary judgment stopped. After the case was remanded back to the district court, Plaintiffs filed their own cross-motion for summary judgment, seeking production of the Padilla Report and requesting that the district court conduct an in camera review of the document. The district court denied Plaintiffs' motion and granted Defendants' previously filed motion without reviewing the

Padilla Report itself, agreeing with Defendants that the public record is excepted from inspection in its entirety as both a matter of opinion within a personnel file and because it is protected by attorney-client privilege under Sections 14-2-1(C) and 14-2-1(G) of IPRA.[1] The district court thus determined as a matter of law that the Padilla Report is not subject to inspection under IPRA.

**{5}** The case thereafter proceeded to trial on Plaintiffs' remaining records requests. The district court found that Defendants committed nine separate violations of IPRA's fifteen-day production requirement by failing to identify several records responsive to Plaintiffs' requests and provide for their inspection, or otherwise give a reasonable explanation as to why certain records were being withheld. *See* § 14-2-8(D). The district court collectively awarded Plaintiffs $411,625 in statutory damages and $214,911.76 in attorney fees and court costs. Defendants appeal various determinations supporting such awards.

**{6}** While Defendants' IPRA violations relate to numerous records requests, the documents principally at issue in Defendants' cross-appeal are (1) Padilla's billing records for services rendered in relation to the Padilla Report; (2) two anonymous "hotline complaints" in which the complainants alleged misconduct by Brooks or his wife, Ann Brooks, and (3) an APS-created investigative report about one such complaint. As to the billing records, Defendants received the Journal's relevant IPRA request on September 3, 2014, but Chavez did not respond substantively until September 26. Chavez's response stated that APS "ha[d] no records to provide," but, purportedly unbeknownst to him, the billing records had been hand-delivered to Analee Maestas, then-President of the Board, on September 25, one day prior.

**{7}** The two "hotline complaints" at issue are anonymous reports originating either through a "1-800" telephone number or a publicly accessible online webpage, both of which are maintained by a third-party vendor called Ethical Advocate. The report about one of the hotline complaints was made by APS's Internal Audit Department as an investigatory follow-up. Regarding all three records, the Journal made its relevant request on September 2, 2014, but Defendants again did not respond until September 26. Although Defendants possessed all three responsive records at the time of the request, their letter in response disclosed the existence of only one hotline complaint, stated that Defendants were not disclosing the complaint because it constituted a matter of opinion contained within a personnel file, and made no mention of the other complaint or the related report. Defendants did, in fact, later produce both complaints for inspection—but not the report—albeit more than two years after Plaintiffs' request.

**{8}** Following trial, the district court concluded that Defendants possessed the billing records at the time of the denial of Plaintiffs' request and violated IPRA in declaring otherwise. The court concluded as well that the hotline complaints were not "matters of

---

[1] The district court did subsequently review the Padilla Report in camera pursuant to a limited order of remand issued by this Court. Upon doing so, the district court adhered to its prior conclusion that the document was entirely excepted from production under IPRA on the same bases previously identified in its order.

opinion" excepted from IPRA, *see* § 14-2-1(C), and Defendants' failure to produce the complaints for two years, or even identify the report about one of them, were wrongful denials of those records under IPRA. After trial, both Plaintiffs and Defendants filed the instant competing appeals.

## DISCUSSION

### I. Plaintiffs' Appeal

{9}     On direct appeal, Plaintiffs challenge the district court's summary judgment determination that the Padilla Report is entirely excepted from production under IRPA on both grounds determined by the district court to be applicable, namely Sections 14-2-1(C) and 14-2-1(G) (matters of opinion within a personnel file and attorney-client privilege, respectively). We address each exception in turn, beginning with attorney-client privilege.

### A. Standard of Review

{10}     We review an order granting or denying summary judgment de novo. *Jones v. City of Albuquerque Police Dep't*, 2020-NMSC-013, ¶ 16, 470 P.3d 252. "Summary judgment is appropriate in the absence of any genuine issues of material fact and where the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted). When considering an order on summary judgment, we view facts "in a light most favorable to the nonmoving party and drawing all reasonable inferences in support of a trial on the merits." *Id.* (internal quotation marks and citation omitted). "A party may not simply argue that such evidentiary facts might exist, nor may it rest upon the allegations of the complaint." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242 P.3d 280 (text only) (citation omitted). The district court's entry of summary judgment in this case requires us to determine the applicability of various IPRA exceptions to the Padilla Report, which is a question of law we also review de novo. *See Cox v. N.M. Dep't of Pub. Safety,* 2010-NMCA-096, ¶ 4, 148 N.M. 934, 242 P.3d 501 ("The meaning of language used in a statute is a question of law that we review de novo." (internal quotation marks and citation omitted)). In particular, we review the applicability of a privilege de novo. *Breen v. N.M. Tax'n & Revenue Dep't*, 2012-NMCA-101, ¶ 21, 287 P.3d 379.

### B. Attorney-Client Privilege

{11}     In granting Defendants' motion for summary judgment, the district court found that the entire Padilla Report was protected by attorney-client privilege under the exception to IPRA established by Section 14-2-1(G). The district court did so on the principal basis that both Padilla and Maestas, who personally hired Padilla on behalf of the Board, submitted affidavits stating that they believed Padilla was providing professional legal services and her related communications would, therefore, be privileged. The district court also relied on a retention letter sent from Maestas to Padilla, which stated the attorney was being hired to "provid[e] professional legal

services to the Board" and that "[t]hose services include . . . research and inquiry into matters of concern to the Board and consultation with the Board [p]resident and members of the Board concerning the results of [Padilla's] work."

**{12}** Plaintiffs, however, assert that Padilla was acting primarily as an investigator rather than legal counsel, and, therefore, facts she unearthed during her investigation are not protected by the attorney-client privilege. Plaintiffs point to Padilla's deposition testimony indicating that her Report contains a factual section distinct from her legal analysis as well as Maestas's verbal statement at a board meeting indicating that she sought counsel "to provide the Board with factual information" and "clear [Brooks] of these accusations once and for all." Plaintiffs contend that the attorney-client privilege, as outlined in Rule 11-503 NMRA, applies to "communications" and not whole documents, and APS was thus required to "assert the privilege with sufficient detail so that Plaintiffs and the [c]ourt may assess the claim of privilege as to each withheld communication." Plaintiffs point to the public policy underpinning IPRA—the need for transparent and accountable government, *see* § 14-2-5—to support a narrow application of attorney-client privilege to prevent public bodies from hiding important factual information from the public under the guise of hiring legal counsel to conduct investigations.

**{13}** We disagree with Plaintiffs and conclude that the Padilla Report in its entirety, including factual information set forth therein, is sufficiently related to Padilla's professional legal services that it is excepted from inspection under IPRA on the basis of attorney-client privilege. *See Henry v. N.M. Livestock Bd.*, 2023-NMCA-082, ¶¶ 17, 21, 538 P.3d 102, *cert. denied* (S-1-SC-39937, Aug. 11, 2023) (holding that documents containing facts relevant to legal services were not discoverable under IPRA). "The elements of attorney-client privilege are a communication made in confidence between privileged persons for the purpose of facilitating the attorney's rendition of professional legal services to the client." *Id.* ¶ 17 (internal quotation marks and citation omitted). Although "the attorney-client privilege should only be applied to protect communications—not facts," *State ex rel. Highway Comm'n v. Steinkraus*, 1966-NMSC-134, ¶ 4, 76 N.M. 617, 417 P.2d 431, "communications themselves . . . even communications concerning facts, are privileged so long as they were made in confidence for the purpose of obtaining legal advice or legal services." *Henry*, 2023-NMCA-082, ¶ 18. It is well established that an attorney, in providing sound and informed legal advice, must inquire into the facts pertinent to the issues on which their advice is sought. *See Upjohn Co. v. United States*, 449 U.S. 383, 391-92 (1981) ("The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant.").

**{14}** The Padilla Report's inclusion of separate factual and legal sections is alone insufficient to strip the former of its privileged status or otherwise divorce it from the whole, which was a report produced as a part of professional legal services provided by Padilla to the Board. *See Henry*, 2023-NMCA-082, ¶ 17 ("The attorney-client privilege protects 'communications' between a lawyer and a client . . . so long as the communication—the *document*, conversation, e-mail, or memorandum—is made for the

purpose of facilitating the rendition of professional legal services to the client." (emphasis added)). "So long as an e-mail or other communication is made privately and not intended for further disclosure except to other persons in furtherance of the purpose of the communication, that communication is a confidential communication protected by the attorney-client privilege." *Id.* ¶ 20 (internal quotation marks and citation omitted).

**{15}** Here, the evidence before the district court supports its conclusion that Padilla was acting as an attorney hired to provide professional legal services regarding the Board's employment of Brooks. Maestas and Padilla attested that communications or feedback Padilla provided as a part of her work for the Board were confidential and privileged. Maestas's letter to Padilla confirmed that Padilla was hired to provide "professional legal services" including "research and inquiry into matters of concern to the Board." Although Maestas told the Board that she was seeking an attorney to obtain factual information and "clear [Brooks] of these accusations once and for all," spoken statements at a board meeting do not overcome the scope of Padilla's employment as defined by the retention letter she received and as described in the affidavits both women made. This evidence was further supported by the district court's subsequent in camera review of the Report in which it affirmed its previous decision regarding the Report's status as privileged. Based on the above evidence, as well as our own review of the Padilla Report, we conclude that Defendants have met their burden in establishing the entire document is sufficiently related to the provision of professional legal services such that it is protected in its entirety by attorney-client privilege.

**{16}** Having so concluded, we briefly address the application of Section 14-2-9(A), which requires separation of exempt and nonexempt information and disclosure of the latter, to documents that are entirely protected by privilege. On this point, we understand Plaintiffs to argue that Section 14-2-9(A) requires a records custodian to deconstruct individual, privileged documents and identify, sentence by sentence, which parts of the requested records are exempt from production and which are not. We reject this proposition. Section 14-2-9(A) states, in part, the following:

> Requested public records containing information that is exempt and nonexempt from disclosure shall be separated by the custodian prior to inspection, and the nonexempt information shall be made available for inspection.

We do not read this statute to impose on public bodies a general obligation to sift through a document that has been successfully established as privileged in its entirety, and parse what may be properly withheld. The definition of "public records" as provided by the Act and the nature of the attorney-client privilege itself contradict such an interpretation. "Public records" are defined by IPRA as "all *documents*, papers, letters, books, maps, tapes, photographs, recordings and other materials." Section 14-2-6(H) (emphasis added). Construed in light of this definition, Section 14-2-9(A)'s requirement that "records . . . shall be separated," as it applies to the attorney-client privilege exception, requires only that exempt and nonexempt documents be separated from one another, not that each statement or section therein be analyzed individually to

determine whether it was properly excepted and withheld. *See Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 14, 121 N.M. 764, 918 P.2d 350 ("We are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole.").

**{17}** This conclusion is bolstered by other, more general discussions of the attorney-client privilege. The Restatement (Third) of the Law Governing Lawyers § 69 (2000) defines a "communication" as, "any expression through which a privileged person . . . undertakes to convey information to another privileged person and any *document or other record* revealing such expression." (Emphasis added.) Section 69, Illustration 7 of the Restatement (Third) of the Law Governing Lawyers further identifies an example of a confidential letter, written from attorney to client, that contains information supplied by the client, "gathered by [the l]awyer from third persons," and garnered by the lawyer's own research, and states that "[e]ven if each such portion[s] of the letter could by be separated from the others, the letter is a communication under this [s]ection." Thus, under both the language of the Restatement (Third) of the Law Governing Lawyers and IPRA, the Padilla Report, although containing facts and information gathered by an attorney, is a confidential communication wholly excepted from production under Section 14-2-1(G).

**{18}** We note, however, that there may be circumstances in which portions of a requested record are so divorced from professional legal services that a district court may properly deem such portions of the record unprotected. In such cases, redaction of any information that *is* protected by privilege may be appropriate. Any such claim, however, would present an inquiry that must be resolved on the specific facts and documents before the district court. *See Albuquerque J.*, 2019-NMCA-012, ¶ 21 ("Failure to adequately support a claim of privilege thwarts both the adversarial process and meaningful independent judicial review and justifies denial of the claim of privilege." (internal quotation marks and citation omitted)). Thus, we emphasize our strong preference that district courts, when practicable, conduct an in camera review of documents where, as here, reasonable argument suggests that a public body *may* be attempting to hide otherwise discoverable facts under the guise of attorney-client privilege. In addition, we reiterate that witnesses with knowledge of facts included in a privileged document cannot use the privilege to refuse to disclose what they know. *Steinkraus*, 1966-NMSC-134, ¶ 4.

**{19}** The dissent suggests that our conclusion today "paves the way for public entities to shield *any* undesirable information from the public eye" and "nullif[ies] an act that is vital to protecting the rights and interests of New Mexicans." *Dissent* ¶ 72. It asserts that, based on our holding, "a public entity seeking to insulate any information from public disclosure need only (1) hire an attorney to perform an action and/or communicate the resulting information, and (2) express their subjective beliefs that the attorney was acting in a legal capacity while doing so." *Dissent* ¶ 85. This mischaracterization, however, omits a third requirement, which has long served as a bedrock principle of attorney-client privilege and is the core of our conclusion today: a party asserting a privilege may not simply declare such to exist but bears the burden of

proving the existence and scope of the privilege to a court of law. *See* Rule 11-104(A) NMRA ("The court must decide any preliminary question about whether . . . a privilege exists."); *Allen v. LeMaster*, 2012-NMSC-001, ¶ 38, 267 P.3d 806 ("A petitioner asserting the attorney-client privilege bears the burden of demonstrating that the privilege applies."); *Albuquerque J.*, 2019-NMCA-012, ¶ 21 ("Failure to adequately support a claim of privilege thwarts both the adversarial process and meaningful independent judicial review and justifies denial of the claim of privilege." (internal quotation marks and citation omitted)); *See Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007-NMCA-133, ¶ 13, 143 N.M. 215, 175 P.3d 309 ("The party claiming privilege has the burden of establishing that a communication is protected as an exception to the ordinary rule."). Such is exactly what happened here.

**{20}** We reiterate that it is courts, and not litigants, that determine whether a document, or information within it, is protected by a privilege. Our holding today does not tarnish this principle and acknowledges that the Padilla Report itself was reviewed by both the district court and this Court and has been deemed protected by attorney-client privilege.

**{21}** The dissent further suggests the attorney-client privilege is intended to protect or otherwise encourage a client's free and honest communications to their attorney but not an attorney's communications to the client. *See dissent* ¶ 79 ("The purpose of the attorney-client privilege in New Mexico is to encourage 'clients to disclose more information to their attorneys.'" (quoting *Bhandari v. Artesia Gen. Hosp.*, 2014-NMCA-018, ¶ 10, 317 P.3d 856)). Yet, in the same breath, the dissent acknowledges that the purpose of the privilege "is to encourage full and frank communication *between attorneys and their clients.*" *Dissent* ¶ 79 (emphasis added) (quoting *Pub. Serv. Co. of N.M. v. Lyons*, 2000-NMCA-077, ¶ 25, 129 N.M. 487, 10 P.3d 166). Lastly, the dissent states that "Padilla was hired first in an investigative capacity to apprise APS of the factual basis underlying a series of reputationally harmful allegations." *Dissent* ¶ 75. In our view, this is a mischaracterization of the record before us, which, as we have explained, shows that Padilla was hired as an attorney to (1) apprise herself of the facts surrounding a potential legal problem facing her client, and (2) provide advice regarding such circumstance.

**{22}** Our conclusion that the Padilla Report is entirely protected by privilege recognizes that it is (1) a communication (2) made in confidence (3) between the Board and its hired legal counsel (4) for the purpose of facilitating the attorney's professional legal services to the Board. *See Henry*, 2023-NMCA-082, ¶ 23 (stating these are the four elements of attorney-client privilege). As such, it is entirely protected by privilege. *See dissent* ¶ 77 (quoting *Henry*, 2023-NMCA-082, ¶ 23).

**{23}** In short, it seems that the dissent objects less to our application of Section 14-2-1(G) in this case and more to the very existence of Section 14-2-1(G) within IPRA itself. The dissent urges the adoption of a version of attorney-client privilege under Section 14-2-1(G) that is narrower than the substantive law governing the privilege in other contexts. However, as we have recently stated, the law governing attorney-client

privilege is the "substantive law governing [its] application . . . as [an] exception[] to IPRA." *See Energy Pol'y Advocs. v. Hector Balderas*, 2024-NMCA-081, ¶ 23, 560 P.3d 37. Moreover, we cannot erase some provisions of a statutory enactment any more than we can add others. That is why it is the province of the Legislature, and not a group of judges, to make changes in the provisions of statutory law. *Varos v. Union Oil Co. of Cal.*, 1984-NMCA-091, ¶ 6, 101 N.M. 713, 688 P.2d 31.

**{24}**    Given then the existence of Section 14-2-1(G), our conclusion rests on established law governing attorney-client privilege itself, as discussed above, *and* our own review of the Padilla report, which reveals that Defendants did not seek to cloak information within the scope of attorney-client privilege that would otherwise be rightly subject to public inspection. Rather, our review confirms that it is a twelve-page report, the contents of which are confined to the specific tasks Padilla was hired to perform. Its length and scope are limited to facts and legal advice related the matters discussed above, and there is no indication that Defendants or the authoring attorney attempted to conceal otherwise inspectable information from Plaintiffs or the public. In short, our review of the Padilla Report confirms that it is what Defendants purported it to be: a report generated by an attorney that, while containing facts, was made in furtherance of the legal services for which the attorney was retained.

## C.    Matter of Opinion

**{25}**    We now turn to Plaintiffs' argument relating to the "matter of opinion" exception to IPRA established by Section 14-2-1(C). Similar to Plaintiffs' argument regarding attorney-client privilege, they assert that the plain language of Section 14-2-1(C) limits the excepted material to "only matters of opinion" and that factual information within responsive records remains subject to public inspection. Plaintiffs further urge us to "clarify [our] own decision" in *Cox*, which, according to Plaintiffs, impermissibly expands the scope of Section 14-2-1(C) beyond its plain meaning. *See Cox*, 2010-NMCA-096. Plaintiffs suggest that Section 14-2-1(C) excepts from inspection only specific opinions contained in documents relating to personnel matters, not whole records themselves, as *Cox* seems to suggest. *See Cox*, 2010-NMCA-096, ¶ 21.

**{26}**    We read Plaintiffs' argument to be substantially the same as that which they advanced regarding attorney-client privilege: that public bodies have a duty to separate exempt and nonexempt information contained within a single document, sentence by sentence, and disclose the latter. Yet both before and since Plaintiffs' briefing in this case, New Mexico appellate courts have rejected Plaintiffs' argument as to Section 14-2-1(C). *See Henry v. Gauman*, 2023-NMCA-078, ¶ 20, 536 P.3d 498 ("Because Section 14-2-1(C) of IPRA describes [an] entire 'letter or memorandum' as exempt, the custodian is required only to separate exempt from nonexempt documents, and make the latter available for inspection." (alterations omitted)); *Cox*, 2010-NMCA-096, ¶¶ 21, 22 (concluding that entire documents or records containing matters of opinion, such as "internal evaluations" and "disciplinary reports," are excepted by Section 14-2-1(C)); *see also State ex rel. Newsome v. Alarid*, 1977-NMSC-076, ¶ 12, 90 N.M. 790, 568 P.2d 1236 (holding that "*documents concerning infractions and disciplinary action*, personnel

evaluations, opinions as to whether a person would be re[]hired or as to why an applicant was not hired, and other matters of opinion are also exempt from disclosure under [IPRA's precursor "right to know"] statute." (emphasis added)),[2] *superseded by statute as stated in Republican Party of N.M. v. N.M. Tax'n & Revenue Dep't*, 2012-NMSC-026, 283 P.3d 853.

**{27}** Plaintiffs argue that the district court improperly relied on *Cox* and *Newsome* to conclude that entire documents containing employer opinion information are excepted from inspection under Section 14-2-1(C). While we disagree that the district court misread either case, our own recent interpretation of the plain language of Section 14-2-1(C) forecloses Plaintiffs' argument. *See Gauman*, 2023-NMCA-078, ¶ 20. *Gauman*, although published after the parties filed briefing in this case, specifically rejects Plaintiffs' contention that the plain meaning of Section 14-2-1(C) should be limited to except only specific statements of opinion within documents addressing employee discipline, as opposed to entire records. This Court held that "[t]he exemption does not state, as it easily could, that 'matters of opinion contained in a letter or memorandum' are exempt, nor does it say 'portions of letters or memoranda that are matters of opinion' are exempt." *Gauman*, 2023-NMCA-078, ¶ 13. Contrary to Plaintiffs' arguments, *Gauman* solidifies that Section 14-2-1(C) requires only that "the custodian . . . separate exempt from nonexempt documents, and make the latter available for inspection." *Gauman*, 2023-NMCA-078, ¶ 20. Thus, Plaintiffs' argument that the district court improperly relied on *Cox*, or that *Cox* impermissibly expanded the scope of Section 14-2-1(C) to include entire documents, contradicts established appellate precedent. Based thereon, we decline to depart from the reasoning in *Cox* and *Gauman*. *See Padilla v. State Farm Mut. Ins. Co.*, 2003-NMSC-011, ¶ 7, 133 N.M. 661, 68 P.3d 901 (setting out four factors that an appellate court must consider before overturning precedent).

**{28}** Lastly, Plaintiffs stated in oral argument before this Court that the records request to which the Padilla Report is a responsive document also included a request for information related to allegations against Ann Brooks, who was not an employee of APS at any time relevant to this case. Plaintiffs argued that a lack of employee status as to Mrs. Brooks renders Section 14-2-1(C) wholly inapplicable to records related to her. While we make no comment on the contents of the Padilla Report, including whether Mrs. Brooks is mentioned therein, we reject Plaintiffs' argument. A record that is produced in contemplation of an employee's future employment with a public body, even if such report includes references to others or incidentally contains allegations of misconduct by persons other than the employee, may still be excepted from inspection under Section 14-2-1(C). Indeed, it is the very nature of most allegations of misconduct that persons other than the employee being investigated will very likely be mentioned in an ensuing investigative report. Such alone, however, does not transmute the nature of

---

[2]*Newsome* construes the meaning of an IPRA predecessor, the "Right-to-Know" Act. *See* 1977-NMSC-076, ¶¶ 30-32 (discussing NMSA 1953, § 71-5-1 (1975 Supp.)). Given that the materials excepted from inspection in that case are, as here, "letters or memorand[a] which are matters of opinion[,]" *Newsome*, 1977-NMSC-076, ¶ 12, we continue to rely on its reasoning in this instance.

the document itself, the purpose of which is to investigate an employee's potential misconduct and assess their future viability as an employee.

**{29}**  To conclude that a record's potential reference to misconduct committed by others removes the document from the exception in Section 14-2-1(C) would publicly disclose information related to an employee's personnel file simply because nonemployees are mentioned therein. *Newsome* long ago admonished courts that the public policy underpinning Section 14-2-1(C) is to protect public employees from disclosure of "adverse opinions . . . in documents concerning disciplinary action . . . that might have no foundation in fact but, if released for public view, could be seriously damaging to an employee." *Newsome*, 1977-NMSC-076, ¶ 12. It would be difficult indeed, if not practically impossible, to permit inspection of the portions of such documents that reference nonemployees without exposing the employee to the embarrassment and damage Section 14-2-1(C) is designed to protect against.

**{30}**  As a final matter, we note that the dissent suggests Section 14-2-1(C) may not be applicable to the Padilla Report at all because Brooks and APS agreed not to keep the Padilla Report in Brooks' personnel file. *Dissent* ¶ 88. However, "the location of a record in a personnel file is not dispositive of whether the exception applies; rather, the critical factor is the nature of the document itself." *Cox*, 2010-NMCA-096, ¶ 21. Thus, precisely where the Report was stored, or how it was otherwise handled, does not control our decision. The dissent further asserts that Section 14-2-1(C) is intended to protect public officials from "disclosure of information that is *untrue* or mere gossip and rumor." *Dissent* ¶ 95. This seems to be squarely applicable to documents, such as the Padilla Report, in which allegations of misconduct are investigated and very often contain unsubstantiated accusations that amount to little more than gossip. Disclosure of such inflammatory and uncorroborated allegations are, by the dissent's own admission, precisely what Section 14-2-1(C) was designed to protect against, and the dissent does not explain how such is not the case here.

**{31}**  We, therefore, affirm the district court's determination that the Padilla Report is excepted from inspection under Sections 14-2-1(C) and 14-2-1(G) of IPRA. Having so concluded, Plaintiffs' remaining argument on direct appeal—related to attorney fees and court costs if successful as to the Padilla Report—fails, and we decline to address it.

## II.  Defendants' Cross-Appeal

**{32}**  On cross-appeal, Defendants advance four arguments challenging (1) the district court's factual findings regarding two complaints made by unknown individuals via an anonymous reporting system (the "hotline complaints"); (2) the district court's conclusion that Defendants wrongfully withheld Padilla's billing records that Defendants did not possess at the time they received Plaintiffs' related request; (3) the denial of their motion for court costs under Rule 1-054(D) NMRA; and (4) the district court's calculation of the time during which statutory damages accrued under Section 14-2-11(C). We address each argument in turn.

## A.     The Hotline Complaints and the Related Investigatory Report

**{33}**     As stated above, the two complaints at issue were made through an anonymous, publicly accessible reporting system maintained on behalf of APS by a third-party vendor called Ethical Advocate. After receiving the "hotline complaints," APS apparently investigated one of them and produced the internal report about it. The district court deemed these three documents responsive to at least one of Plaintiffs' IPRA requests, and, after trial, Defendants were found liable for failing to timely produce them. Specifically, the district court found that the complaints were created by a process separate from APS's Human Resources Department, that they were distinct from regular personnel records relating to employee evaluations, and based on the evidence presented, "it was impossible to know" if either complainant was, in fact, an APS employee. Critically, the district court found that the hotline (either the telephone number or the webpage) is open to the public and is, therefore, more comparable to the citizen complaints discussed in *Cox* than internal personnel records subject to protection under Section 14-2-1(C). *See Cox*, 2010-NMCA-096, ¶ 11 (holding that complaints about state employees generated by members of the public are "available to the public for inspection"). The district court, therefore, concluded the hotline complaints were not matters of opinion within a personnel file and were wrongfully withheld under IRPA.

**{34}**     As to the report, the district court found that APS possessed it at the time Chavez received Plaintiffs' relevant request, failed to identify it in its response, and never produced the report or offered a denial or explanation as to why it was not produced. The district court concluded such to violate IPRA.

**{35}**     On appeal, Defendants argue that the complaints and report were exempt from production under IPRA as matters of opinion within personnel files. *See* § 14-2-1(C). Specifically, Defendants challenge the district court's factual finding that the hotline complainants were not APS employees. They assert that the sole witness to testify on the matter, APS's then director of its Internal Audit Department, Margaret Koshmider, provided unrebutted testimony that the complaints were "most likely, or more likely than not, [APS] employees." Defendants argue that, as such, the preponderance of evidence indicates that the hotline complainants were APS employees, and the complaints are, therefore, internally created documents excepted from inspection under Section 14-2-1(C). Defendants continue that the report, although neither identified to Plaintiffs nor produced, is excepted from IPRA on the same basis.

**{36}**     We review a district court's findings of fact for substantial evidence. *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. "Substantial evidence means relevant evidence that a reasonable mind could accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "This Court will resolve all disputed facts and indulge all reasonable inferences in favor of the trial court's findings." *Id.* In reviewing a factual finding, "the question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Sonntag v. Shaw*, 2001-NMSC-015, ¶ 22, 130 N.M. 238, 22 P.3d 1188 (text

only) (citation omitted). "When there is a conflict in the testimony, we defer to the trier of fact." *Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, ¶ 37, 301 P.3d 387 (text only) (citation omitted). "We will not reweigh the evidence nor substitute our judgment for that of the fact[-]finder." *N.M. Tax'n & Revenue Dep't v. Casias Trucking*, 2014-NMCA-099, ¶ 20, 336 P.3d 436 (internal quotation marks and citation omitted).

**{37}**   Here, only one witness, Koshmider, testified regarding the potential identity of the persons who generated the two hotline complaints at issue. While her testimony is, therefore, not contradicted by any other evidence, Koshmider herself equivocated repeatedly about the employment status of each complainant. Koshmider stated, based on her experience and the content of each complaint, that the complainants responsible for each hotline tip were "more likely than not" APS employees. However, she continued that she never affirmatively determined the identity of either complainant and that it was "impossible to know" for certain if each complainant was an APS employee. She also conceded that it is possible that an APS employee with knowledge of the subject matter contained in either complaint communicated that information to a nonemployee who then complained.

**{38}**   Koshmider's testimony permits a reasonable fact-finder to conclude that the complaints were not internally created documents possibly protected by Section 14-2-1(C). *See Shaw*, 2001-NMSC-015, ¶ 22 (in reviewing for substantial evidence, we look only to the evidence which supports the district court's finding). While Koshmider certainly testified that the complainants were likely APS employees, she could not be definitive in her assessment of probability. Koshmider's hunch in this regard, however confident, is also by her own words possibly mistaken. Koshmider repeatedly stated that she could not know for certain if the complainants were APS employees and we will neither reweigh her testimony nor substitute our judgment for that of the district court. *See Casias Trucking*, 2014-NMCA-099, ¶ 20.

**{39}**   Defendants also seem to argue that the hotline complaints are excepted from IPRA under Section 14-2-1(C) regardless of who made them. This presents a question of law we review de novo. *See Cox*, 2010-NMCA-096, ¶ 4 ("The meaning of language used in a statute is a question of law that we review de novo." (internal quotation marks and citation omitted)). We find our reasoning in *Cox* controlling and decline to accept Defendants' argument. *Cox* states that the exception embodied by Section 14-2-1(C) applies to matters of opinion that constitute "personnel information of the type generally found in a personnel file, i.e., information regarding the employer/employee relationship such as internal evaluations; disciplinary reports or documentation; promotion, demotion, or termination information; or performance assessments." *Cox*, 2010-NMCA-096, ¶ 21. Thus, we held in *Cox* that records exempt from production under this exception are those "generated by an employer or employee in support of the working relationship between them." *Id.* ¶ 22.

**{40}**   Here, the hotline complaints are similar to the citizen complaints in *Cox* in that they were made through a reporting mechanism that is open to the public. *See id.* ¶¶

24-25. We reasoned in *Cox* that, although the complaints in that case may have led to disciplinary action against the public employee, "this fact by itself does not transmute such records into matters of opinion in personnel files." *Id.* ¶ 24 (internal quotation marks omitted). We further stated that the information within the complaint belongs to the citizen who made it and not to the public body that received the complaint. *Id.* ¶ 25. Such is true of the hotline complaints in this case. As stated by the district court, the hotline complaints here were created through a system open to the public; they were kept separate from APS's Human Resources Department—which generally maintains personnel records related to employee evaluations—and, as discussed above, there is inconclusive evidence to establish that the complainants were APS employees. In light of such facts, we conclude that the hotline complaints were not "generated by [the] employer or employee in support of the working relationship between them," and are, therefore, not exempt from production under Section 14-2-1(C). *See Cox*, 2010-NMCA-096, ¶ 22.

**{41}** Lastly, we decline to resolve whether the related report about one hotline complaint, which was produced by APS's Internal Audit Department as an investigatory follow-up, qualifies as a matter of opinion within a personnel file. The district court determined APS to have violated IPRA by failing to disclose the report's existence or provide an explanation for withholding it, and its related imposition of fines and fees rests solely on that basis. Because such failures are a violation of IPRA on their own, we need not engage in further analysis. *See Britton v. Office of the Att'y Gen.*, 2019-NMCA-002, ¶ 36, 433 P.3d 320 (holding that failure to identify a public record or issue a written denial of the related request is a violation of IPRA); *see also Crutchfield v. N.M. Dep't of Tax'n & Revenue*, 2005-NMCA-022, ¶ 36, 137 N.M. 26, 106 P.3d 1273 ("A reviewing court generally does not decide academic or moot questions."). We, therefore, affirm the district court's factual findings and conclusions of law regarding the two hotline complaints and the related investigative report.

## B.    Padilla's Billing Records

**{42}** After trial, the district court awarded the Journal statutory penalties in the amount of $117,450 for Defendants' failure to provide billing records related to Padilla's services. Defendants argue that, although APS did have the billing records at the time it responded to the Journal's relevant request on September 26, 2014, it did not receive the bills from Padilla until after Chavez had both received the request and conducted his search. Defendants assert that practical considerations as well as persuasive authority from both within New Mexico and around the country urge us to adopt the rule that public bodies incur no obligation to produce records they do not have at the time an IPRA request is received, regardless of subsequent obtainment. Plaintiffs, on the other hand, argue that nothing within IPRA indicates that there is a "cutoff date" regarding IPRA requests and this Court's ad hoc creation of such a limitation, should we declare such to exist, would contravene the public policy underpinning the Act. *See* § 14-2-5. Neither Plaintiffs nor Defendants point us to any authority, nor have we found any, that establishes a cutoff date by which, upon receiving an IPRA request, records custodians in New Mexico may appropriately conclude their search. Nor have we found any

authority establishing a date in relation to a request upon which a public entity is deemed to possess or not possess a given record such that it must be disclosed under IPRA. Stated differently, there is no cutoff date or event established by IPRA or binding jurisprudence beyond which a public entity need not disclose the existence and possession of a responsive record. As such, the issue presented is one of first impression.

**{43}** The facts relevant to the billing records at issue are not in dispute. On September 3, 2014, Defendants received a public records request from the Journal for "all invoices or other billing records from Butt, Thornton & Baehr, P.C. [(BTB)] since January 1, 2014." BTB is the law firm that employed Padilla while she prepared the Padilla Report. Chavez thereafter began his search for any such billing records possessed by APS. Chavez first inquired with Maestas as to the existence of invoices received from Padilla or her firm, and Maestas directed Chavez to APS's Risk Management Division, stating any such records would have been sent there. Chavez thereafter asked the Risk Management Division if it had received any such bills, and was told that it had not. Chavez completed his search sometime on or before September 25, 2014, after also inquiring about Padilla's billing records with APS's accounts payable office and APS Board Services and finding no responsive documents.

**{44}** The next day, on September 26, Chavez sent his letter to the Journal summarizing his search and denying its request on the grounds that APS had "no records to provide." Notably, Chavez's letter did not include any qualification as to the effective date of his response or any other information indicating a temporal limitation on his search. Critically, BTB produced a bill for Padilla's services on September 16, 2014, but kept it in their possession until hand-delivering it to Maestas on September 25, one day *before* Chavez issued his denial. Indeed, soon after sending his response denying the Journal's request, Chavez was notified by APS's Risk Management Division that they had received a bill from the law firm. Nonetheless, Chavez did not send a new response to the Journal updating them as to the existence of the record because, relying on the New Mexico Department of Justice's IPRA Compliance Guide, it was Chavez's belief that a public body is only responsible for addressing documents it possesses at the time a public records request is received. *See* N.M. Dep't of Just., *N.M. Inspection of Public Records Act Compliance Guide* 33 (2015) (hereinafter Compliance Guide), https://www.nmag.gov/wp-content/uploads/2021/11/Inspection-of-Public-Records-Compliance-Guide-2015-Edit.pdf ("The right to inspect applies to any nonexempt public record that exists at the time of the request.").[3]

**{45}** At the conclusion of trial and based on the above facts, the district court found that Defendants did, in fact, possess billing records responsive to the Journal's request when Chavez sent his denial letter. It further found that Defendants had access to the records as of September 16 because its hired attorneys, as agents, prepared the bills

---

[3]We note that the Compliance Guide has since been updated from the 2015 version but provides substantially the same provision as it did during the events at issue. *See* Compliance Guide 11 (2024), https://nmdoj.gov/wp-content/uploads/NMDOJ-IPRA-Guide-Ninth-Edition.pdf ("[T]he public body will only provide documents that exist at the time the request is received.").

and had them in their possession as of that date. The district court pointedly found that Chavez could have contacted BTB or Padilla during the pendency of his search, and thereby obtained the billing records, but did not do so. It therefore concluded that Defendants' failure to produce the requested records violated IPRA.

**{46}** Defendants' central contention—that a public body is only responsible for producing documents it possesses at the time it receives a public records request—requires us to interpret several provisions of IPRA, which is an issue of statutory construction we review de novo. *See N.M. Found. for Open Gov't v. Corizon Health*, 2020-NMCA-014, ¶ 15, 460 P.3d 43.

**{47}** In the instant case, the district court provided alternate bases for its conclusion that Defendants violated IPRA regarding their failure to produce the requested billing records. First, it concluded the bills were "used, created, received, maintained or held by or on behalf of APS" as of September 16 when they were completed and held by the law firm but before they were delivered to APS. Second, it stated that Defendants had actual possession of the bills on September 25 when they were hand-delivered to Maestas, and Defendants' response on September 26 to the contrary was, therefore, false. While we are unable to affirm on the former rationale used by the district court, the record supports affirmance on the latter.[4]

**{48}** IPRA defines "public records" as

> all documents, papers, letters, books, maps, tapes, photographs, recordings and other materials, regardless of physical form or characteristics, that are used, created, received, maintained or held by or on behalf of any public body and relate to public business, whether or not the records are required by law to be created or maintained.

Section 14-2-6(H). IPRA imposes an affirmative duty on public agencies to respond to requests it receives by either providing for inspection of responsive public records or issuing a denial explaining its "reasonable, good-faith belief that the record falls within one of IPRA's enumerated exemptions." *Britton*, 2019-NMCA-002, ¶ 31; *see* §§ 14-2-1, -12. The Act, therefore, does not permit public agencies who possess a document or item that conforms to the definition of "public record" to deny its inspection without asserting the applicability of some statutory exception. *See* §§ 14-2-1 to -12. Nonetheless, IPRA is silent as to when a document becomes "possessed" by a given public entity. Stated differently, neither the Act nor New Mexico case law establishes

---

[4]We decline to resolve whether Defendants "possessed" the bills at issue before they were delivered to APS, and note that the district court's conclusion in this regard lacks specific analysis based upon facts in the record. *Cf. State ex rel. Toomey v. City of Truth or Consequences*, 2012-NMCA-104, ¶ 13, 287 P.3d 364 (providing a nine-factor analysis to determine whether a private contractor is "acting on behalf of any public agency" for purposes of IPRA); *Corizon Health*, 2020-NMCA-014, ¶ 21 (concluding that only where "there is no distinction" between a private contractor and a public entity may records held by the contractor be considered public records under IPRA). Because we affirm the district court on alternate grounds on which it also relied, we decline to further address this basis for the court's conclusion.

what date, if any, public agencies are to use to conclude their records search or beyond which date newly obtained records are beyond the purview of a received request.

{49}    Defendants urge that we limit the scope of responsive documents to only those maintained or held by or on behalf of any public body when it receives the relevant request. Defendants argue that a contrary holding could result in an "endless loop" of searches in which records custodians receive a records request, inquire for responsive records with the appropriate offices, wait for such offices' replies, and before issuing a denial stating that no relevant records exist, reconduct their search due to the possibility that an expected record had been created or received while the search was ongoing. Defendants assert that public agencies—particularly large organizations with many internal departments and offices, such as APS—"should be entitled to the certainty" that if a timely search is conducted and responsive records are not then discovered, the agencies' subsequent denial will not be deemed a violation of IPRA should responsive documents arrive during or after the search.

{50}    Defendants' arguments are not without merit. Indeed, taken to their logical extreme, and considering the stark absence of statutory guidance as to a cutoff date applicable to IPRA requests or the searches they generate, Defendants' rightly worry that requests will effectively create a standing obligation on public bodies to supplement denials previously issued in order to inform requestors that documents previously sought have since come into possession of the public body. To this very concern, the district court, in concluding Defendants violated IPRA, found, "After denying the request for the billing records . . . Chavez became aware that APS in fact possessed the bills. Despite this, he did not produce them to the Journal or to KOB-TV."

{51}    Nonetheless, the strict statutory requirement IPRA places on public agencies to disclose the existence of public records "maintained or held" by them, § 14-2-6(H), coupled with the absence of clarity from precedent or IPRA itself and the overarching public policy underlying IPRA, combine to defeat Defendants' arguments. IPRA "declare[s it] to be the public policy of this state[] that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers." Section 14-2-5. Our appellate courts have repeatedly admonished that we "must construe IPRA in light of its purpose and interpret it to mean what the Legislature intended it to mean, and to accomplish the ends sought to be accomplished by it." *Britton*, 2019-NMCA-002, ¶ 27 (internal quotation marks and citation omitted). In considering on appeal a given evidentiary record related to an IPRA request—each of which in this Court's experience is unique from the last—we must bear in mind "the presumption that public policy favors the right of inspection." *Cox*, 2010-NMCA-096, ¶ 17 (internal quotation marks and citation omitted).

{52}    Here, Defendants denied the Journal's request for the bills on September 26, stating that APS "had no records to provide," when, in fact, the bills had been hand-delivered to Maestas the previous day. The district court observed, "Nothing in IPRA states or implies that a records custodian need only make available for inspection those records that were in the public body's possession at the time of the request, as opposed

to the time of the custodian's response." We agree with the district court but express concern as to its suggestion, stated above, that a records custodian is responsible for updating requestors after a response has been issued. We explain.

**{53}** Defendants ask us to graft onto IPRA a provision that limits the scope of responsive documents to only those possessed by a public entity at the time it receives a request. We decline to do so because such a gloss on the Act would be at odds with IPRA's expressly stated underlying policy. *See* § 14-2-5; *see also Faber v. King*, 2015-NMSC-015, ¶ 15, 348 P.3d 173 ("We will not read into a statute language which is not there, especially when it makes sense as it is written." (internal quotation marks and citation omitted)); *Varos*, 1984-NMCA-091, ¶ 6 ("It is the province of the [L]egislature to make changes in the provisions of statute law.").

**{54}** Simply put, Defendants denied an IPRA request on the basis that they did not have the records requested when, in fact, they did. It is noteworthy that the records were possessed by the chairperson of the APS Board and that she was aware of Plaintiffs' IPRA request. The district court found that Chavez consulted with Maestas about the request before sending the denial letter. The identity of the person possessing the billing record, the chairperson of the Board, further contextualizes the district court's decision to hold APS accountable for not supplementing the response. Under such facts, we cannot exculpate Defendants from that civil liability expressly provided for by IPRA. *See* § 14-2-1, -12. While statutory silence may often permit us to infer legislative intent, we cannot, and will not, interpret IPRA in a manner that undermines its expressly stated and strongly reiterated public policy. *See Britton*, 2019-NMCA-002, ¶ 29 ("The starting point for any court tasked with resolving an IPRA challenge is to place into statutory context the particular arguments made vis-à-vis the Legislature's declared purpose in enacting IPRA.").

**{55}** Defendants, therefore, improperly denied the Journal's request at the time of their response stating that they did not have any responsive documents to provide when, in fact, they did.[5] Moreover, the nature of Defendants' response asserted an absence of records with no qualification as to the conclusion of its search being some day or days prior to the date of the response itself. Given these facts, we cannot disagree with the district court's determination that Defendants violated IPRA as to the BTB billing records sought by Plaintiffs.

**{56}** Defendants' stated concerns regarding what they perceive could become an endless, standing obligation to update responses previously issued for each and every IPRA request are adequately addressed by IPRA's current text. As stated, IPRA imposes a duty on public entities to disclose the existence of records responsive to a request and either permit inspection thereof or assert the applicability of a statutory exception. *See* §§ 14-2-1, -11. If, as here, such a response is factually inaccurate

---

[5]We suggest that the Legislature consider and address the ambiguity surrounding the time when a public record is deemed to be possessed in relation to a given IPRA request or ensuing search by a public entity. The Act's silence regarding such a date leaves courts, public bodies, and the general public alike without guidance as to which documents fall within the scope of a request.

regarding the public entity's possession of such records, the public entity is in violation of IPRA and a subsequent corrective letter may limit the entity's liability for having violated IPRA in its response. However, if a public entity, in fact, does *not* possess responsive records at the time its denial letter is issued but subsequently gains possession, the entity's response was accurate, it remains in compliance with IPRA, and nothing in the statute or interpretive case law suggests that any future update to a past, closed IPRA request—which could always be renewed by the requestor—is required by IPRA or otherwise warranted.

**{57}** We, therefore, affirm the district court's determination that Defendants violated IPRA by denying the Journal's request on the basis that they did not have any records to provide when, as of the date of Defendants' response, they did possess such records. Our holding does not imply, and IPRA does not create, a general duty that public agencies must update valid and accurate responses to requests that have already been properly denied under IPRA.

## C. Rule 1-054(D) Costs for a "Prevailing" Public Body Defendant

**{58}** Defendants next argue that the district court erred as a matter of law when it ruled that Section 14-2-12(D) precludes an award of costs to which they might otherwise "be entitled pursuant to Rule 1-054(D)." Defendants assert that, having been successful in their claim that the Padilla Report was exempt from inspection, they are the "prevailing party" regarding "more than half of the parties' litigation efforts," and that nothing within IPRA precludes an award of costs under Rule 1-054(D) to public body defendants who are successful in defending an IPRA enforcement action.

**{59}** After trial, the district court determined that Plaintiffs were entitled to "costs and reasonable attorney fees pursuant to [Section] 14-2-12(D)." Defendants thereafter filed their own motion for an award of partial costs, pursuant to Rule 1-054(D), in their favor requesting $3,630.23 for costs related to the Padilla Report, or, alternatively, $542.18 for costs incurred in obtaining Sanders' testimony. The district court denied Defendants' motion, and collectively awarded Plaintiffs $18,398.25 in costs. The district court's order stated, "As a matter of law, Section 14-2-12(D) . . . precludes the [c]ourt from awarding any costs to . . . Defendants to which they might otherwise be entitled pursuant to Rule 1-054(D)." The district court continued, noting that it, therefore, "does not have discretion to grant any costs to . . . Defendant[s]." Importantly, the district court reduced Plaintiffs' requested award for costs by the amount it deemed arose "solely out of legal services related to the Padilla [R]eport." Despite this reduction, Defendants still seek a distinct award of costs in their favor.

**{60}** Defendants' argument requires us to determine whether Section 14-2-12(D) displaces the general costs provision in Rule 1-054(D), which is an issue of statutory construction we review de novo. *See Cox*, 2010-NMCA-096, ¶ 4. Section 14-2-12(D) provides the following:

D.     The court shall award damages, costs and reasonable attorney[] fees to any person whose written request has been denied and is successful in a court action to enforce the provisions of [IPRA].

The Act does not, however, provide for, or even contemplate, an award of costs for prevailing defendants. *See* §§ 14-2-1 to -12. Rule 1-054(D), in part, further provides for an award of costs in general civil matters as follows:

Unless expressly stated either in a statute or in these rules, costs, other than attorney fees, shall be allowed to the prevailing party unless the court otherwise directs; but costs against the state, its officers, and agencies shall be imposed only to the extent permitted by law.

Defendants argue that IPRA's statutory silence does not operate as a preclusion of such costs under Rule 1-054(D) and rely on the traditional rule of statutory construction that "laws should be read harmoniously so as to give effect to both the statute and the rule." *See, e.g.*, *Miller v. Bank of Am., N.A.*, 2015-NMSC-022, ¶ 18, 352 P.3d 1162 ("Whenever possible, we will read statutes in harmony, to give effect to all provisions."). While this principle of statutory interpretation is generally true, IPRA's text outside of Section 14-2-12(D), its underlying policy considerations, and our own case law contradict Defendants' argument and lead us to conclude that IPRA's damages provisions preclude an award of costs to public agency defendants, even if such defendants are entirely successful in an IPRA enforcement action against them.

**{61}**   Put simply, the language of Section 14-2-12(D) does not permit an award of costs to public bodies. Section 14-2-12(D) expressly allows for costs to be awarded to "any person whose written request has been denied" but does not mention such an award for public body defendants. This Court has consistently interpreted such statutory omissions as deliberate and we will not now construe the Legislature's failure to provide for an award of costs to successful public bodies as implicit permission to do so under Rule 1-054(D). *See Schultz ex rel. Schultz v. Pojoaque Tribal Police Dep't*, 2013-NMSC-013, ¶ 36, 484 P.3d 954 ("[W]hen the Legislature includes a particular word in one portion of a statute and omits it from another portion of that statute, such omission is presumed to be intentional." (internal quotation marks and citation omitted)); *Cordova v. Cline*, 2021-NMCA-022, ¶ 9, 489 P.3d 957 ("The Legislature knows how to include language in a statute if it so desires." (alteration, internal quotation marks, and citation omitted)).

**{62}**   IPRA's underlying public policy, which places strong emphasis on access to public records by "all persons," further supports our conclusion. *See* § 14-2-5. As we have indicated, IPRA is intended to promote transparency in government and is specifically designed to enable requestors to obtain the "greatest possible information regarding [its] affairs." *Id.* IPRA's cost-shifting provisions, embodied by Section 14-2-12(D), are crafted to further these public policies by "encourag[ing] individuals to enforce IPRA on behalf of the public and ensur[ing] that the entire process is virtually costless to a successful litigant." *Am. Civ. Liberties Union of N.M. v. Duran*, 2016-

NMCA-063, ¶ 42, 392 P.3d 181 (alteration, internal quotation marks, and citation omitted). Allowing a public body to be awarded costs as a matter of law under Section 14-2-12(D) for successfully defending an IPRA enforcement action would threaten potential plaintiffs with possible future penalties for advancing colorable, albeit ultimately unsuccessful, IPRA claims. Such a holding would constitute an impermissible chilling effect on potential future claims that contravenes IPRA's strongly supported and oft reiterated public policy underpinnings. We therefore conclude, based on IPRA's text itself and its underlying policy, that Section 14-2-12(D) does not permit an award of costs to public body defendants, even if entirely successful.

## D.      Accrual of Statutory Damages

**{63}**    Defendants lastly challenge the district court's calculation of statutory damages entered against them pursuant to Section 14-2-11(C). In support of their claim on appeal, Defendants advance two primary arguments. First, Defendants argue, somewhat obliquely, that the only mandatory accrual of statutory damages in this case was "from August or September 2014 until September 26, 2014, when Defendants issued their denial." As we explain below, we read Defendants' argument on this point to be that their denials of Plaintiffs' requests were reasonably in compliance with IPRA, and accrual of statutory penalties under Section 14-2-11(C) after issuance of such denials was, therefore, not mandatory. Second, Defendants argue that, as a matter of law, the district court erred in ruling that it did not have discretion under Section 14-2-11(C) to disregard the amount of time taken by Sanders' appeal, which Defendants argue was a third-party appeal not of their own making.

**{64}**    The relevant facts are undisputed. Defendants received various IPRA requests from Plaintiffs regarding Brooks' resignation in late August and early September 2014. Defendants' substantive responses to these requests were all issued in mid- or late September 2014 and were generally beyond IPRA's fifteen-day response deadline. As described above, during litigation in the matter, Sanders, Brooks' attorney and a nonparty in this case, took an appeal against Plaintiffs regarding a discovery order Sanders believed violated attorney-client privilege. *See Albuquerque J.*, 2019-NMCA-012. Resolution of that interlocutory appeal took over 1,200 days during which statutory damages accrued under Section 14-2-11(C). After trial, the district court concluded that the majority of Defendants' responses to Plaintiffs' requests were unreasonable for various reasons articulated in its order. At a post-trial hearing in which the district court heard argument regarding accrual of statutory damages, the court stated it did not "see where IPRA allows [the court] to reduce the number of days to which statutory damages apply. However, IPRA does give the court discretion to set the rate of per diem damages under 14-2-11(C)(2), which is what [the court has] done." Defendants appeal, presenting substantially the same arguments as those they made before the district court.

**{65}**    Defendants' arguments require us to interpret the meaning of Section 14-2-11(C) to determine what discretion, if any, it provides a district court in determining the number of days on which statutory damages accrue pursuant to a violation of IPRA. This

presents an issue of statutory construction we review de novo. *See Cox*, 2010-NMCA-096, ¶ 4. Plaintiffs argue that this Court should review the district court's assessment of statutory damages merely for support by substantial evidence because, in their view, Defendants' simply challenge the amount of damages entered against them. However, Defendants do not make any argument regarding the actual amount of damages for which they were found liable. At no point in briefing to this Court do Defendants assert that the district court's selection of either $25 per day or $50 per day—the two amounts used for all IPRA violations in this case—was erroneous. Rather, we read Defendants' arguments to challenge the district courts' legal conclusions regarding the meaning of, and the amount of discretion permitted by, Section 14-2-11(C). Thus, our review is de novo.

**{66}** Section 14-2-11(C) provides, in pertinent part, the following:

> C.    A custodian who does not deliver or mail a written explanation of denial within fifteen days after receipt of a written request for inspection is subject to an action to enforce the provisions of the Inspection of Public Records Act and the requester may be awarded damages. Damages shall:
>
> . . . .
>
> > (2)    not exceed one hundred dollars ($100) per day;
> >
> > (3)    accrue from the day the public body is in noncompliance until a written denial is issued.

Defendants first rely on Section 14-2-11(C)(3) to argue that statutory damages were only mandatory until the dates it issued its relevant responses in September 2014. However, this Court has previously explained, and the district court stated in its order, that a court may still award statutory damages after a written denial is issued if the denial is deemed unreasonable. *See Britton*, 2019-NMCA-002, ¶ 38 ("If . . . the facts of a case support the conclusion that the public body's failure was 'unreasonable,' the district court must award statutory damages."). As we explained in *Britton*, this is to prevent public bodies from avoiding substantive compliance with IPRA by issuing "perfunctory" responses that fail to meaningfully address the request. *See id.* ¶¶ 38, 41.

**{67}** Here, the district court found all of Defendants' responses that served as a basis for statutory damages to be unreasonable, and Defendant does not challenge the district court's determinations in that regard. Rather, Defendants merely assert that the only mandatory calculation of damages under Section 14-2-11(C) was from the date of its noncompliance to the date of its responses. We disagree. Defendants concede that Section 14-2-11(C) contains mandatory language with which a district court must comply, and without argument that the district court's findings of unreasonableness were made in error, we find no basis to reverse the district court's calculation of statutory damages in this case.

**{68}**  As to Defendants' second argument—that the district court erred in concluding it did not have the discretion when calculating statutory damages to disregard the time taken by a third-party appeal—we disagree for several reasons. First, as we stated above, *Britton* admonishes that Section 14-2-11(C) is mandatory, and without a finding that the public agency's written denial was reasonable, statutory damages must be awarded. *Britton*, 2019-NMCA-002, ¶ 38. Second, the Legislature *did* grant district courts discretion in considering the facts and circumstances of each case, and in determining the amount of per diem statutory damages necessitated thereby, by permitting the district court to award statutory damages in any amount up to $100 per day. *See* § 14-2-11(C)(2). Indeed, the district court's statement that it considered such discretion when assessing such damages against Defendant alleviates any concern we may have here that Defendants were unfairly subjected to damages resulting from a three-and-a-half year delay they did not cause.

**{69}**  Finally, we do not consider Sanders' appeal in this case to truly be a "third-party appeal" during which Defendants were merely forced to wait before continuing their defense against Plaintiffs' claims. Defendants joined Sanders in her appeal and, as stated, told this Court "the central issues of [Sanders'] appeal bear on the core interests of APS." To this end, Defendants filed briefs and presented argument adverse to Plaintiffs. In such circumstance, the facts of this case do not require that we decide whether a substantial delay caused by a truly unrelated third-party appeal justifies accrual of statutory damages.

**{70}**  We, therefore, conclude, based on the foregoing analysis, that Section 14-2-11(C) contains mandatory language requiring district courts to assess statutory damages for the relevant period of noncompliance. Defendants were deemed out of compliance with IPRA regarding several of the requests they received up to the date of trial because their written denials were unreasonable. As such, the district court's assessment of statutory damages for that period was not error.

**CONCLUSION**

**{71}**  For the reasons set forth, we affirm.

**{72}  IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**I CONCUR:**

**MICHAEL D. BUSTAMANTE, Judge,**
**Retired, sitting by designation**

**BOSSON, Justice, retired, sitting by designation,**
**Specially concurring in part and dissenting in part**

**BOSSON, Justice, retired, sitting by designation (specially concurring in part and dissenting in part).**

{73}   Although I concur in the majority's resolution of Defendants' cross-appeal, I am unable to concur in the majority's conclusion that the Padilla Report is exempt from disclosure under IPRA under either exception. The circumstances surrounding the nature of the Padilla Report and the secret settlement agreement between APS and former Superintendent Brooks demonstrate the critical need for public accountability in such situations, and the impropriety of keeping such actions secret. In oral argument before this Court, Plaintiffs' counsel warned that affirming the district court's decision regarding the applicability of IPRA exemptions would "provide[] a roadmap of how to keep misconduct by public officials secret from the people of New Mexico." This is not hyperbole. The majority opinion paves the way for public entities to shield *any* undesirable information from the public eye. This is directly contrary to the core tenets of IPRA—transparency and accountability—and threatens to effectively nullify an act that is vital to protecting the rights and interests of New Mexicans. I respectfully dissent.

{74}   The following is drawn from information in the public record. After becoming aware of allegations of wrongdoing on the part of then-Superintendent Brooks, APS hired an attorney, Ms. Padilla, to investigate the allegations and prepare a report detailing her findings and providing legal advice to the School Board. Padilla sent the report containing her findings to Board President Ms. Maestas on August 6, 2014. That concluded Ms. Padilla's contract, which she fulfilled competently and professionally.

{75}   Five days later, on August 11, 2014, a private Board meeting was held to discuss the Padilla Report. Brooks and APS entered into a settlement agreement on August 15, 2014, negotiating his resignation as Superintendent of APS in exchange for a lump sum payout of $350,000 in public funds, mutual confidentiality, and indemnity from civil suit for both him and his wife. Only nine days transpired between Padilla's submission of the Report and Brooks' resignation pursuant to the settlement agreement. The sheer haste with which Brooks and APS reached this settlement only days after learning of the report's factual content—and of course the size of the payoff—strongly suggest that the contents of the Padilla Report cannot have been favorable to either Brooks or APS.

{76}   Based on this chain of events, and this Court's review of the Padilla Report, I am convinced of the following. Padilla was hired first in an investigative capacity to apprise APS of the factual basis underlying a series of reputationally harmful allegations. Padilla prepared a report containing mostly factual findings, which was then used as the underlying basis for what amounted to little more than a hush money payment to secure Brooks' resignation and avoid further embarrassment. The price for his departure: $350,000 in public funds. At its core, the covert nature of these events constitutes a kind of constructive fraud on the people of New Mexico. This is the quintessential circumstance that IPRA is designed to reveal. The people have a right to know what is happening in their government.

**{77}** Unfortunately, in holding the Padilla Report exempt from disclosure, the majority opinion fails to protect that right, and in so doing opens the door for the further invalidation of the fundamental provisions of IPRA.

### III.     The Factual Section of the Padilla Report is Not Privileged

**{78}** Under Section 14-2-1(G), "attorney-client privileged information" is exempt from disclosure under IPRA. The attorney-client privilege in New Mexico is codified in Rule 11-503(B) NMRA, which specifies that "[a] client has a privilege to refuse to disclose . . . a confidential communication made for the purpose of facilitating or providing professional legal services to that client." Thus, under Section 14-2-1(G)'s attorney-client privilege exception, information is exempt from IPRA disclosure if it is "(1) a communication (2) made in confidence (3) between privileged persons (4) for the purpose of facilitating the attorney's rendition of professional legal services to the client." *Henry*, 2023-NMCA-082, ¶ 23 (internal quotation marks and citation omitted). "The burden of proving an assertion of privilege rests upon the party asserting such claim." *Albuquerque J.*, 2019-NMCA-012, ¶ 16 (internal quotation marks and citation omitted).

**{79}** I am convinced that the primary purpose of the Padilla Report was not to provide legal advice, and therefore, is not protected by the attorney-client privilege. As the ultimate authority on the scope of the attorney-client privilege, it is now up to our Supreme Court to review the report and determine whether it is privileged. *See State v. Serna*, 2013-NMSC-033, ¶ 14, 305 P.3d 936 (explaining that "the ultimate rule making authority over procedure resides in [our New Mexico Supreme Court]").

**{80}** The purpose of the attorney-client privilege in New Mexico is to encourage "clients to disclose more information to their attorneys." *See Bhandari*, 2014-NMCA-018, ¶ 10; *see also Lyons*, 2000-NMCA-077, ¶ 25 (providing that the purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice" (internal quotation marks and citation omitted)). The United States Supreme Court has observed that because "the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose," and therefore "protects *only those disclosures necessary to obtain informed legal advice* which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976) (emphasis added). New Mexico has not yet expressly addressed whether the attorney-client privilege is limited to situations where it achieves its stated purpose, but such an approach to the privilege would be appropriate in the context of IPRA, where "[t]he citizen's right to know is the rule and secrecy is the exception." *Newsome*, 1977-NMSC-076, ¶ 34.

**{81}** Our courts have, however, recognized that not all actions undertaken by an attorney on behalf of their client will fall within the attorney-client privilege. *See Bhandari*, 2014-NMCA-018, ¶ 12 (recognizing that attorneys "also provide non[]legal services, such as negotiating contracts, analyzing potential corporate transactions, and investigating potential claims" (internal quotation marks and citation omitted)); *Santa Fe*

*Pac. Gold Corp.*, 2007-NMCA-133, ¶ 23 (providing that the attorney-client privilege "protects communications generated or received by an attorney giving legal advice but does not protect communications derived from an attorney giving business advice *or acting in some other capacity*" (emphasis added)). This recognition that there *is* a distinction between professional legal services and other services performed by an attorney has not yet yielded a clear understanding in New Mexico of where exactly the demarcating line falls. What is clear to me, however, is that the Report falls outside the proper scope of the attorney-client privilege.

{82}   The report is divided into two separate sections: a recitation of facts, as found by Ms. Padilla during her investigation, and a discussion of the implications of those facts. First, the purpose of the attorney-client privilege is not met here because the facts in the Padilla Report seemingly did not originate from Ms. Padilla's client, but rather, her own investigation, including interviews with third parties. Thus, application of the attorney-client privilege to Ms. Padilla's independent fact-finding does not further the goal of Rule 11-503 to encourage "clients to disclose more information to their attorneys." *See Bhandari*, 2014-NMCA-018, ¶ 10. There is no evidence that the factual information gleaned from interviews with nonclients in this case was disclosed contingent upon the information being privileged. *See Fisher*, 425 U.S. at 403 (providing that the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege").

{83}   Second, under New Mexico precedent, the Padilla Report's "primary or predominate purpose" was not to provide legal advice, and therefore is not protected by the attorney-client privilege. *See Bhandari*, 2014-NMCA-018, ¶¶ 16-21 (emphasis omitted) (adopting the primary purpose test to determine whether a dual-purpose communication is privileged under the attorney-client privilege and concluding that a memorandum prepared by an attorney which included both legal and business advice was predominantly business advice, and therefore not privileged). Here, it appears that the primary purpose of the Report was to convey to the Board Ms. Padilla's factual findings regarding allegations against Brooks. Even the majority acknowledges that Ms. Maestas told the Board that she would be retaining independent counsel to provide the Board with "hard facts" regarding allegations against Brooks, and to "clear [Superintendent Brooks] of these accusations once and for all." The majority of the Padilla Report—the fact section—resembles a human resources investigation, which is a business, not legal, consideration. *See Koumoulis v. Indep. Fin. Mktg. Group, Inc.*, 295 F.R.D. 28, 45 (E.D.N.Y. 2013) (providing that where the content of a communication—detailing the results of a human resources investigation—demonstrates that the communication's "predominant purpose was to provide human resources and thus business advice, not legal advice" the communication is not privileged, and that an attorney's involvement in the investigation or the drafting of the communication "does not transform what would otherwise be human resources and business communications into legal communications"), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).

**{84}** Of course, as the majority points out, *see Maj. op.* ¶ 13, "The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn Co.*, 449 U.S. at 391-92. But it does not necessarily follow that we should extend the attorney-client privilege to fact-finding investigations that can be as competently performed by a nonattorney as an attorney. *See* 24 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5478 (1st ed. June 2024 Update) ("The better view would seem to be that investigative work is not 'professional legal services' and that no privilege applies where the lawyer's primary function is as a detective."); *see also* Wright, *supra*, at § 5478 ("[T]he privilege should only apply where the investigation is one that cannot be carried on by non[]lawyer investigators; e.g., where the matters to be investigated are legal documents whose meaning would not be apparent without legal training."); *cf. Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Ct. for City & Cnty. of Denver*, 718 P.2d 1044, 1049 (en banc) (Colo. 1986) (holding that the lengthy facts section of a memorandum prepared by an attorney investigating the issuance of a lease guaranty insurance policy did not fall within the attorney-client privilege, because the attorney's actions in "conducting interviews with various officers and employees for the purpose of determining the factual circumstances underlying the issuance of the policy" meant that "the attorneys were acting more in the role of claims investigators than legal counsel").

**{85}** The only evidence seemingly relied upon by the district court, and subsequently the majority, in determining that the services provided by Padilla to APS were "professional legal services" are the affidavits of Padilla and Maestas. Those affidavits state that they "believed Padilla was providing professional legal services" to APS. *Maj. op.* ¶ 11. Maestas also sent a retention letter to Padilla stating that Padilla was being hired to render legal services. The majority does not cite any authority to support the proposition that an individual's belief that they are retaining an attorney to provide legal services is sufficient to establish that the attorney was, in fact, providing legal services. This approach was rejected by our Supreme Court nearly a century ago when it explained that "an attorney might not decide for himself whether a given communication with his client was privileged," because the question of "whether a given communication is privileged, [is] to be determined by the court after an examination into the attending and characterizing circumstances under which the communication was made." *Bujac v. Wilson*, 1921-NMSC-024, ¶ 7, 27 N.M. 112, 196 P. 513. "The fact that during the time [a lawyer] was acting as attorney for his client he wrote the letters does not, standing alone, establish their privileged character." *Id.* ¶ 8. This Court has recently endorsed a similar principle—regarding what a public agency must demonstrate to establish a prima facie case for summary judgment on IPRA's attorney-client privilege exception—explaining that "[a] public agency's burden to justify the withholding of information in an enforcement proceeding in district court cannot be satisfied by a good-faith assertion that all of the documents withheld or redacted were privileged or confidential." *Energy Pol'y Advocs.*, 2024-NMCA-081, ¶ 23.

**{86}** The only other inferable basis for the majority's conclusion that the Padilla Report constitutes "professional legal services" is that the individual who prepared it is an attorney. Again, such a conclusion is untenable. *See Bujac*, 1921-NMSC-024, ¶ 8;

*United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1968) ("The mere fact that a person is an attorney does not render as privileged everything [they do] for or with the client."); *Anaya v. CBS Broad., Inc.*, 251 F.R.D. 645, 650 (D.N.M. 2007) ("Channeling work through a lawyer rather than having non[]legal personnel perform it does not provide a basis for claiming attorney-client privilege."). This assertion, paired with a substantial reliance on the client's and attorney's affidavits, creates a dangerous new principle: a public entity seeking to insulate any information from public disclosure need only (1) hire an attorney to perform an action and/or communicate the resulting information; and (2) express their subjective beliefs that the attorney was acting in a legal capacity while doing so. Whether intentional or not, such is the natural result of the majority's opinion. As Plaintiffs' counsel warned, this provides a clear roadmap for keeping misconduct, and any other form of undesirable information, secret from the people of New Mexico.

**{87}** As the primary purpose of the Padilla Report was to conduct and provide the results of an extensive factual investigation, with the stated purpose of acquiring said information and clearing Brooks' name, the report—or at least the fact section within—should not be subject to the attorney-client privilege. *See United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990) ("Communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence."); *Ex parte Birmingham News Co., Inc.*, 624 So. 2d 1117, 1130 ("No attorney-client privilege attaches to investigative reports that are merely compilations or synopses of facts found by members or associates of law firm from reviewing documents and interviewing witnesses and *that are merely factual findings that were not acquired from the client*." (emphasis added)); *Bhandari*, 2014-NMCA-018, ¶ 18 ("[T]he entire communication is privileged only if the legal purpose outweighs the business purpose." (internal quotation marks and citation omitted)). IPRA's stated purpose in protecting the public's entitlement "to the greatest possible information regarding the affairs of government and the official acts of public officers and employees," *see* § 14-2-5, compels such a result.

**{88}** I acknowledge that there is a lack of New Mexico precedent on this issue to rigorously support either the majority's or this dissent's positions. However, it is clear from the circumstances, which outcome best supports the public policies underlying both IPRA and the attorney-client privilege, and best reflects what kinds of actions on the part of attorneys should and should not be privileged. "In order for government to truly be of the people and by the people, and not just for the people, our citizens must be able to know what their own public servants are doing in their name." *San Juan Agr. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 16, 150 N.M. 64, 257 P.3d 884. The purposes of IPRA, the implications for the First Amendment of the U.S. Constitution, and the public's right to know demonstrate that disclosure of the factual investigation is the proper outcome in this case. *See, e.g.*, 24 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5475 (1st ed. June 2024 Update) (describing "a number of considerations that militate against the expansion of the [attorney-client] privilege to all governmental entities," including a concern that "granting the government the power to suppress evidence of communications between

government employees and government lawyers is inconsistent with the openness to scrutiny that is thought by some to be the hallmark of a truly democratic republic"). The majority's opinion will redefine how IPRA and the attorney-client privilege interact in our state, and may have far-reaching consequences for attorneys as well as the public. Intervention on the part of our Supreme Court as the sole court with superintending control over attorneys and the attorney-client privilege will be helpful in this instance.

**IV.     The Case Law Underlying the "Matters of Opinion" Exception is Antithetical to the Purpose and Nature of IPRA and Should be Reevaluated.**

**{89}** Additionally, the majority concludes that the entirety of the Padilla Report is exempt from IPRA disclosure pursuant to the Section 14-2-1(C) exception for "letters or memoranda that are matters of opinion in personnel files." First, I note at the outset that this exception may be wholly inapplicable to the Padilla Report, as the exception specifies that it applies to those documents that are "matters of opinion *in personnel files*." *Id.* (emphasis added). The Settlement Agreement, however, explicitly states that the report is to be kept in a file separate and apart from Brooks' personnel file. Thus, APS would have our courts insulate its report as if it were part of a personnel file while contractually agreeing *not* to put it in that same personnel file. These two options are mutually exclusive. APS cannot reap the benefits of both. As the Padilla Report is contractually excluded from Brooks' personnel file, the Section 14-2-1(C) exception does not apply.

**{90}** That aside, I acknowledge the recent case law from this Court that appears to support Section 14-2-1(C) exception in this case. I write separately on this issue to address what I perceive to be a profound deviation from the established purpose of IPRA in this line of precedent.

**{91}** The stated purpose of IPRA is to "ensure . . . that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees," and it is "an essential function of a representative government" to provide the public with such information. Section 14-2-5. This principle has long been recognized by our Courts. In *Newsome*, our New Mexico Supreme Court provided that "[t]he citizen's right to know is the rule and secrecy is the exception." 1977-NMSC-076, ¶ 34.

**{92}** The Court in *Newsome* also sought, for the first time, to outline the scope of Section 14-2-1(C) and the documents contemplated therein. The Court held that "letters of reference, documents concerning infractions and disciplinary action, personnel evaluations, opinions as to whether a person would be re[]hired or as to why an applicant was not hired, and other matters of opinion are . . . exempt from disclosure under [Section 14-2-1(C)]." *Newsome*, 1977-NMSC-076, ¶ 12. The Court did so with limited analysis and without any citation to precedential or persuasive authority. *See id.* The rationale behind exempting this list of documents from disclosure stemmed from the Court's perception that "there would be critical material and adverse opinions" in

these types of documents "that might have no foundation in fact but, if released for public view, could be seriously damaging to an employee." *Id.*

**{93}**   This list of exempt documents has been consistently relied upon in setting the boundaries of the Section 14-2-1(C) exception since it was first espoused in *Newsome* almost fifty years ago. As recently as 2023, this Court held that "the Legislature intended the 'letters or memorandums which are matters of opinion' in personnel files exemption to apply to documents concerning disciplinary action and promotions, characterizing these documents as a whole as 'opinion information.'" *See Gauman*, 2023-NMCA-078, ¶ 14 (internal quotation marks and citation omitted). However, the rationale for this characterization has shifted.

**{94}**   Whereas *Newsome* grounded its rationale in the principle that such documents could contain baseless and potentially harmful statements of opinion, more recent opinions place significantly more emphasis on preserving the sanctity of the employer/employee relationship. For instance, this Court has previously determined that "[t]he documents listed by the *Newsome* Court are all documents generated by an employer or employee in support of the working relationship between them" and that, based on this point of similarity, "[i]t is clear . . . that the Court intended 'other matters of opinion' to apply to documents of the same general category as those in the specific listing." *See Cox*, 2010-NMCA-096, ¶ 22. Like the *Newsome* Court, this Court in *Cox* reached this conclusion with no additional rationale or citation to persuasive authority. Unfortunately, our current Court has further endorsed this viewpoint, recently holding that "[t]he purpose of the exemption . . . is to protect the employer/employee relationship from disclosure of any 'letters or memoranda' that are generated by an employer or employee in support of the working relationship between them." *Gauman*, 2023-NMCA-078, ¶ 15 (internal quotation marks and citation omitted).

**{95}**   This transition from focusing on the potential harm of disclosing documents containing unsubstantiated rumors, as was seemingly contemplated in *Newsome*, to focusing on the proposed list of exempt documents and the nature of the employer/employee relationship, has—in my opinion—done a significant disservice to the letter and purpose of IPRA. The list of documents provided in *Newsome* is secondary to the underlying purpose of rendering such documents exempt: to protect employees from the disclosure of harmful opinions and information that is lacking in factual support. *See Newsome*, 1977-NMSC-076, ¶ 12. Under this reading of *Newsome*, documents that are contained in a personnel file, but do not threaten to baselessly harm an employee, could still be subject to disclosure. In other words, documents that fall within the enumerated list espoused in *Newsome* could still be subject to disclosure, provided that the contents "have a foundation in fact" and are not comprised of unsubstantiated rumor. *See id.*

**{96}**   The purpose of Section 14-2-1(C) is not to insulate public officials from disclosure of information that may prove reputationally harmful, but rather to protect them from disclosure of information that is *untrue* or mere gossip and rumor. This is in line with the tenets of transparency and accountability that form the core of IPRA. As *Newsome* itself

states, "The citizen's right to know is the rule and secrecy is the exception." *Newsome*, 1977-NMSC-076, ¶ 34. Under the modern approach which emphasizes the nature of the employer/employee working relationship, however, such documents are exempt seemingly without regard for their contents. This was not what was contemplated by the *Newsome* Court, and it is untenable now.

**{97}** The facts and circumstances of this case perfectly demonstrate how this modern approach undermines IPRA's purpose. Here, the Padilla Report ultimately led APS, a public entity, to utilize hundreds of thousands of taxpayer dollars to sweep the issues raised by the report, and the results of the investigation therein, under the proverbial rug. The reasons why APS entered the settlement agreement, and the contents of the Report, have never been released to the public. And under the modern approach to Section 14-2-1(C), the people will *never* be privy to this information—a drastic curtailment of their "right to know that the people they entrust with the affairs of government are honestly, faithfully and competently performing their function as public servants." *See Bd. of Comm'rs of Doña Ana Cnty. v. Las Cruces Sun-News*, 2003-NMCA-102, ¶ 29, 134 N.M. 283, 76 P.3d 36 (internal quotation marks and citation omitted), *overruled on other grounds by Republican Party of N.M.*, 2012-NMSC-026, ¶ 16.

**{98}** This is not a circumstance involving an innocent employee assailed by gossip and meritless rumor. *Newsome* intended to protect such *unsubstantiated* claims from disclosure. The Padilla Report is more than that. The use of the Padilla Report— predominantly a recitation of facts resulting from a professional investigation—as the basis for a private settlement agreement, which included the transfer of hundreds of thousands of dollars of public funds, functionally takes the report out of the realm of mere conjecture into the realm of operative fact.

**{99}** This is exactly the kind of circumstance that necessitates transparency, accountability, and public disclosure. IPRA requires no less. *See* § 14-2-5 ("[I]t is declared to be the public policy of this state[] that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees. It is the further intent of the [L]egislature, and it is declared to be the public policy of this state, that to provide persons with such information is an essential function of a representative government and an integral part of the routine duties of public officers and employees."). The people have a right to know.

**{100}** IPRA is of vital importance in protecting the interests and rights of New Mexico citizens. The recent case law interpreting the IPRA exception for "letters or memoranda that are matters of opinion in personnel files," *see* § 14-2-1(C), represents a substantial deviation from what was contemplated by the *Newsome* Court. The majority opinion is, in my opinion, the first step on a path that ultimately provides public entities with the means to shield any information from public disclosure. The facts of this case provide a clear example of a public agency attempting to covertly disguise what could be described as a hush money payment using extensive public funds. This is an egregious

example of the manipulation of IPRA's exceptions, but given the majority's resolution of these issues and the new principles it endorses, it will not be the last.

**{101}**  As of this writing, there is a lack of both New Mexico Supreme Court and Court of Appeals authority on both of these exceptions. Resultingly, this case will be the first and leading authority on the interpretation of IPRA and its exceptions going forward. Unfortunately, it is the first step down a path that places in jeopardy IPRA's most critical functions. Disclosure must be the default, the exceptions must be specific and narrow, and the public's right to knowledge and transparency regarding the actions of their public officials must be preserved. The people of our state would greatly benefit from intervention on the part of our Supreme Court.

**RICHARD C. BOSSON, Justice,**
**Retired, sitting by designation**